Richardson, J.,
delivered the opinion of the court:
The facts in this case, aside from the regulations, instructions, and circular-letters of the Commissioner of Internal Revenue relating to meters generally, are few and simple.
In the year 1868 and subsequently the claimants had two distilleries, numbered 1 and 4, in the twenty-second collection district of Pennsylvania. Upon printed blanks furnished by the Commissioner to all distillers thejr made applications through the collector of the district, on the 9th and 23d of October of that year, for meters for distillery No. l,and therewith made with the collector the deposit required by the regulations for the price of the same, $2,050; and on the 12th of March, 1869, for meters for distillery No. 4, with the required deposit for the price, $2,100. These applications were duly forwarded to che Commissioner, and by him transmitted to Mr. Cice, the manufacturer. The meters thus applied for were delivered at the distilleries, those for No. 1 December 19,1868, and those for No. 4 July 26,1869. The certificates of deposit for said sums of money issued upon ordering the meters were sent bythe collector to Mr. Tice and were received by him. The meters for distillery No: 1 were never set up, as the distillery ceased to run long before any person went there to make the attachment, and those for No. 4 were set up and attached about September 1,1869, hut never worked properly. It does not appear that the meters were tested before being shipped from the manufactory, or that ary officer was detailed to supervise their attachment or to test then after attachment, or that daily reports were made by the storekeeper to the assessor setting forth the indications as shown bj *393 the meters at noon, or that meter-indications were considered by the assessor in making his monthly computation of the product of said distilleries.
The legal questions which arise relate to the duties, rights, and liabilities of the respective parties, under the statutes and the regulations, circulars, and instructions of the Commissioner of Internal Eevenue respecting distilleries and meters and the object and use of meters, in connection with these facts. It is necessary, therefore, to make a careful examination of those statutes and regulations.
By the Act July 20, 1863, (16 Stat. L., 125, chap. 186,) which was passed by Congress before the transactions set forth in the findings occurred, it was provided, among other things, in section 1, “ that there shall be levied and collected on all distilled spirits on which the tax prescribed by law has not been paid a tax of 50 cents on each and every proof-gallon, to be paid by the distiller, owner, or person having possession thereof, before removal from distillery warehouse,” and in section 2 “that proof-spirits shall be held and taken to be that alcoholic liquor which contains one-half its volume of alcohol of a specific gravity of seven thousand nine hundred and thirty-nine ten-thousandths (.7939) at sixty degrees Fahrenheit.”
In order to primarily determine the quantity of spirits produced at any distillery liable to be taxed, the following requirements were made, some for precautionary purposes and some for direct application :
By section 15 it was enacted “ that every distiller shall provide, at his own expense, a warehouse, to be situated on and to constitute a part of the distillery premises, to be used only for the storage of distilled spirits of his own manufacture, * * * and such warehouse, when approved, * * * is hereby declared to be a bonded warehouse of the United States.” * *
By section 16, “The owner, agent, or superintendent of any distillery, established as hereinbefore provided, shall erect, in a room or building to be provided and used for that purpose and for no other, * * two or more receiving-cisterns, each to be at least of sufficient capacity to hold all the spirits distilled during the day of twenty-four hours, into which shall be conveyed all the spirits produced in said distillery, * * * and on the third day after the spirits are conveyed into such cisterns, [or, on application to the assessor, at any time previous to the *394 third day,] the same shall be drawn, off into casks under the supervision of such gauger in the presence of the storekeeper, and be removed directly to the distillery warehouse.”
By section 23, “ All distilled spirits shall be drawn from the receiving-cisterns iuto casks, * * and shall thereupon be gauged, proved, and marked by an internal-revenue gauger, * * * and shall be immediately removed into the distillery warehouse.” * *
By section 19 the distiller was required, on the 1st, 11th, and 21st of each month, to render to the assistant assessor an account, taken from his books, of the quantity and kind of materials used for the production of spirits each day, and the number of wine-gallons and of proof-gallons produced and placed in warehouse; and this return was to be under oath, and any false entry subjected the distiller to penalties. By section 53 the gauger was required to make a daily return to the assessor as well as collector of all articles gauged and proved or inspected by him, and for whom, and the number and kind of stamps used by Mm. The storekeeper in charge of the warehouse (§ 21) was to record in a book a daily account of all the meal and vegetable productions or other substances brought into the distillery or on the premises, to be used for the purpose of producing spirits, and of all spirits drawn from the receiving-cistern, and some other items. By the regulations he, too, reported all these facts from his books to the assessor monthly.
Upon the receipt of the returns from the distiller, three times a month, the assistant assessor was, by the instructions, to make a personal examination of the books and premises, and of the accuracy of the entries, and then transmit the returns to the assessor.
Up to this point in the proceedings the distiller had become liable to the tax on all spirits that had been reported as gauged by the gauger, and included in his own sworn return of the quantity produced, and no more, his return being regarded as conclusive unless some error or fraud should be detected.*
The next step was provided for by section 20. “ On the receipt of the distiller’s first return in each month the assessor shall inquire and determine whether said distiller has accounted in Ms returns for the preceding month for all the spirits produced by him; and to determine the quantity of spirits thus to be accounted for the whole quantity of materials used for the produc *395 tion of spirits shall be ascertained, and forty-ñve gallons of mash or beer brewed or fermented from grain shall represent not less than one bushel of grain, and seven gallons of mash or beer brewed or fermented from molasses shall represent not less than one gallon of molasses. In case the return of the distiller shall have been less than the quantity thus ascertained, the distiller or other person liable shall be assessed for such deficiency.” * * *
We omit any reference to the manner of paying the tax as not material to the issues here raised.
Thus the quantity to be taxed was primarily determined by gauging the spirits as they were transferred from the cisterns to the casks. But as the spirits might remain till the third day in the cisterns, it was possible for the distiller, by fraud, to withdraw portions therefrom before gauging and so avoid the tax to a greater or less extent, or they might be under-measured by the gauger; and the principal method relied upon to detect such fraud was by the calculations of the assessor, under the twentieth section, and his comparison of the quantity accounted for by the distiller with the capacity of the distillery and the quantity of materials used.
But in the act of 1868 there was inserted, in section 2, (15 Stat. L., 125,) a further provision, intended to afford additional protection to the G-overnmént and to enable frauds to be more readily detected, as there was in the previous act of 1867. (14 Stat. L., 481, chap. 169, § 15.) It was in these words: “And the Commissioner of Internal Revenue, for the prevention and detection of frauds by distillers of spirits, is hereby authorized to adopt and prescribe for use such hydrometers, saccharometers, weighing and gauging instruments, meters, or other means for ascertaining the quantity, gravity, and producing capacity of any mash, malt, or beer used or to be used in the production of distilled spirits, and the strength and quantity of spirits subject to tax, as he may deem necessary.” * * * And by section 3 it was enacted “ that whenever the Commissioner of Internal Revenue shall adopt and prescribe for use any meter, meters, or meter-safes, it shall be the duty of every owner, agent, or superintendent of a distillery to furnish and attach, at his own expense, such meter, meters, or meter-safes as may have been prescribed for use at his distillery, and to furnish all the pipes, materials, labor, and facilities necessary to *396 complete such attachment, in accordance with the regulations of the Commissioner.” * * *
On the 16th of September, 1868, the Commissioner issued a circular, of which the parts material to the present consideration were as follows:
“ Notice is hereby given that the Commissioner of Internal. Revenue has adopted and prescribed for use in distilleries the spirit-meter invented by Mr. Isaac P. Tice, of New York.”
“The meter adopted being the invention of Mr. Tice, and secured to him by letters patent, can only be made by^him or under his license; and in order to guard against an unreasonable price being demanded of those who are bound by law to purchase it, the prices of the several sizes, under an arrangement made between Mr. Tice and the Government, have been determined by a committee consisting of * * * all practical and skilled machinists, two of whom were designated by the Government and one by Mr. Tice, and the sums hereinbefore named are the prices agreed upon by them for the meters delivered at the place of manufacture.” * * *
“ Under the provisions of section 3, distillers are required to procure and attach meters, and in making their applications therefor they must state the capacity of the still in cubic feet, and its utmost possible producing-capacity per minute.” * * *
“ This application will be made on Form 7, as heretofore prescribed, which will be furnished by the collectors of the several districts. At the time of making the application the applicant will furnish to the collector of his district a certificate of deposit in a United States depository for the amount of the price of the meter or meters, payable to the order of Mr. Tice, and the collector will certify upon such application that he has received such certificate, and forward the application to this office for transmission to Sir. Tice.”
“ Upon the delivery of the meter to the distiller, the collector will at once transmit the certificate of deposit to Mr. Tice at his address, 314 Third avenue, New York City.”
“ Meters will be attached under the joint supervision of the manufacturer, or his agent, and of an assistant assessor, who *397 will be specially detailed for that purpose by the assessor of the district, who will report the name of such assistant to this office.”
“The expenses of transportation and attachment of the meters, and of any changes required to be made in the distillery, are to be paid for by the distiller.”
“ So long as meters are ready for delivery, distillers must procure and attach them. Should any distiller refuse to procure and attach a meter, it will be the duty of the collector to close the distillery, and forthwith institute the proper proceedings for its condemnation and the enforcement of the penalties as provided' by law.” .
On the same day the Commissioner addressed a letter to Mr. Tice, notifying him of the adoption of his meter and directing him to proceed with the construction, provided he was willing to do so upon the conditions therein set forth, and among them were the following:
“ First. Samples of the meters A and B, and of the. single and double counter-meter, will be kept, and each set of meters will be tested and compared with the sample by an officer detailed for that purpose before being removed from the factory, and again after being finally attached to the distillery; and if any meter, upon being so attached, shall prove to be defective in any respect, the defective part shall be replaced or a new meter furnished without additional expense to the distiller.”
“ Fifth. You are to furnish the meters in good order and condition, ready for transportation, at the prices fixed by the committee, which are as follows:
One meter was required to be attached to the tail of the worm of the still, and, in case of the manufacture of high wines, another was attached to the doubler, so as to register all the spirits which came in a manufactured state from the still; and if correctly kept, and the proper calculations made, they would give the exact quantity of spirit which passed in the' cistern. The storekeeper, a different officer from the ganger, who, as we have seen, measured the spirit as it passed from the cistern into the casks, was required by the regulations to make a daily report to the assessor of the indication of the meter at 12 o’clock meridian, and the assistant assessor was required to render a like report whenever he visited the distillery. And the instructions were that the assessors “in making their *398 monthly computation [under section 20, above cited] will use the information thus given in determining the production;” that is, in determining whether or not the distiller had accounted in his returns for all the spirits produced.
Notwithstanding the requirements of the Commissioner, the meters generally did not prove a complete success, either because of the trouble and expense they caused to the distillers, the additional trouble to the storekeeper, assessor, and other officers, the reductiqn of the tax on spirits from $2 to 50 cents a gallon, thereby lessening the object and the attempts to commit fraud, or for other causes, and on the 8th of June, 1871, the then Commissioner issued a circular in these terms: “ It having been ascertained by experience that these meters, as a class, do not fully answer the purpose for which they were intended, their'' use is hereby discontinued, and all existing orders prescribing the same are revoked. All meters attached to distilleries may be detached. The meters being the property of distillers, they will be permitted to dispose of them as they desire.” And in June, 1872, so much of sections 2 and 3 of the act of 1868 as related to meters was repealed, and the further use of meters was finally abandoned by law. (17 Stat. L., 239.)
There were circulars and instructions from the Commissioner of Internal Kevenue of different dates, which we shall have occasion to refer to hereafter; but we have cited enough from the statutes and regulations to show distinctly the object of introducing the meter, for whose benefit it was to be used, and the respective duties of the distillers and the officers of the" United States in relation thereto. They may be thus recapitulated :
1. The meter was for the use and benefit of the defendants, to enable them to prevent and detect frauds by distillers, and for no other purpose, and its method of use was an additional means afforded the assessor of determining with more or less accuracy whether the distiller had accounted in his returns for all the spirits produced by him, or whether some had not been abstracted from the cistern before being gauged, or the gauger had fraudulently under-measured and under-registered the quantity. If not used by the officers, the defendants lost the benefit of one check upon the distillers, and that was all.
2. It was the duty and the obligation of the distiller to furnish and attach, at his own expense, the meter prescribed, and *399 to furnish all tbe pipes, materials, and labor necessary to complete the attachment. To him it was an expense and a tax imposed by statute as a condition to his right to continue his business, and if he omitted to comply with the terms of the law a penalty might have been exacted of him under section 96, or the officers would close the distillery.
3. The duties of the public officers were :
First, those for the benefit of the defendants¡. — An officer was to be detailed to test the meters before removal from the manu-factory, and again after being finally attached, and some officer was to supervise the attachment. The storekeeper was to register the indications of the meter daily and report to the assessor ; the assistant assessor was also frequently to examine and report the indications of the meter, and the assessor was to use those reports, in his computations, to detect frauds.
Second, those for the benefit of the distillers. — The collector was to receive applications for meters, take a certificate of deposit in the name of Mr. Tice for the price at which the manufacturer had agreed to furnish them, to forward the applications to the Commissioner, by whom they were to be transmitted to Mr. Tice, and, upon the delivery of the meters to the distiller, the collector was required to “at once transmit the certificate of deposit to Mr. Tice, to his address in New York.” That was all the Commissioner undertook to do for the distiller, and was the only contract, express or implied, that was made with him by the defendants. And this was wholly gratuitous on the part of the Commissioner, and for the sole benefit of the distillers, to protect them from extortion by the manufacturer, who had a patent on his meter, and but for the precaution of the Commissioner in making an arrangement as to price might have compelled distillers to submit to unreasonable prices or great extortion. But this did not preclude distillers from purchasing from the manufacturer directly at any price, or from purchasing of other parties at second hand. Distillers were by law to furnish the meters, and the law would have been complied with, however they obtained them. The distillers did, however, incidentally gain another advantage by applying for meters through the collectors. When they made application to the collector, and made a deposit of the price, they complied with the regulations, and would not be proceeded against for not having other *400 wise furnished and attached the meters required by law. Until the meters arrived they would have all the benefits which would accrue to them from the instruments themselves without the expense of attaching them, and, so far as they were concerned, it would be to that extent more profitable that no meter should be delivered.
Upon these provisions of the statutes and regulations, principally, the claimants’ case must stand or fail.
The action is founded ou contract, and the breaches set forth in the petition are of two classes:
1. That no assistant assessor was ever officially detailed to supervise the attachment of meters at their distilleries; that no notification of any such appointment or detail ever reached them ; that no assistant assessor ever did superintend the attachment of said meters or the adjustment thereof; that no complete attachment or perfect adjustment of said meters was ever made; and, furthermore, that said meters were never used at their distilleries “ for the prevention of frauds,” or ascertaining the quantity of spirit subject to tax.
And the facts found substantially support these allegations. But every one of these acts which were omitted or neglected by the defendants’ officers were to be done for the benefit of the defendants and not for the claimants. The requirements of the regulations that the meters should be tested, their attachment and adjustment supervised, and the meters used for the prevention and detection of fraud by the distillers, were not contracts with the claimants, but were directions to the defendants’ officers, the neglect of which might work all the harm and loss to the Government which the statute authorizing the adoption of meters was intended to prevent, and could not injure the claimants. It was of no object to the claimants to have these things done. If the defendants’ officers had insisted upon the attachment of the meters, and supervised the same, the claimants would have been subjected to so much additional cost. The regulations specify that “ the expenses of transportation and attachment of the meters, and of any changes required to be made in the distillery, are to be paid by the distiller,” and “ distillers must furnish all lumber and other materials necessary for the attachment of the meter, and such workmen and assistants as may be required.” To that extent, then, the claimants were benefited by the acts complained of.
*401 This court, as well as the Supreme Court, has repeatedly held that the United States was not liable for the wrongful acts of their officers, which are not breaches of contracts, even when those acts cause loss and damage to other parties; and it is a novel proposition to claim that the Government is liable for the neglect of duties by public officers when such neglect works, as in this case, not only no injury to the claimants, but in fact a pecuniary gain to them, while it may have subjected the defendants to great loss. The proposition really is, that the defendants shall beheld liable to others for injuries and losses inflicted on themselves by their own officers. And still more novel is the claim that the defendants are liable to a distiller because their officers did not use the meters to prevent and detect his frauds. If he were not committing frauds their use would be of no importance, and it he were committing frauds their detection would be the last thing he would desire. The claimants did not pay the money, now sought to be recovered, in consideration that the public officers would do their duty|to the defendants in the particulars named, and the defendants never contracted with them that those officers should perform their duty, -ijsuo» jou soop jo pounqdaioo sjou oqj op oj oiupuj eqj os pun tute a failure of consideration entitling the claimants to recover back the money paid.
2. The petition also sets forth allegations that the money for the meters was paid to the collector upon the implied contract that the United States would supply, through said collector, merchantable and perfect meters for use in and about the distillery premises, for the purposes set forth in the laws and regulations, and of value equal to the amount deposited; and they declare that the meters received by them were valueless and useless.
Yf e find n o such contract. The money was paid that the manufacturer should furnish the meters required for the claimants’ distilleries by the law's and regulations, in order that they might be permitted to carry on their business; for without them their distilleries might be closed and they subjected to penalties. The statute required distillers to furnish meters not for their own use, but for the use of the defendants. The defendants undertook no more than to have their officers receive the application for the meters, with a certificate of deposit in the name of Mr. Tice, the manufacturer, for the price, to transmit the *402 application at once to the manufacturer, and to forward to him the certificate of deposit as soon as the meters were delivered at the distillery. As soon as the deposit was made the distillers were considered as having complied with the statute, and if they were not complained of or disturbed it was immaterial whether the meters ever arrived or not, and if they arrived it was equally immaterial to them whether or not they were perfect for the purpose intended — the prevention and detection of frauds by themselves. And it does not appear that the meters in this case were unmerchantable, valueless, or useless. They were never used, because the defendants’ officers neglected the duties they owed to the Government, and in 1871 all meters were abandoned by the Commissioner, because it had been ascertained by experience that they, as a class, did not fully answer the purpose for which they were intended; but this does not establish the fact that the meters delivered to the claimants were either unmerchantable, valueless, or useless, and we have no other facts on that subject.
The counsel for claimants in their brief maintain that the deposits made with the collector were unwarrantably forwarded to Mr. Tice,, the manufacturer, too soon, and that the collector was bound to retain them until the meters were attached to the distilleries and tested, and that the defendants, through their officers, have had the claimants’ money and have misapplied it.
• In our opinion these propositions are not supported by the facts.
The regulation of September Id, 1868, provided that “at the time of making the application [for meters] the applicant will furnish to the collector of his district a certificate of deposit in a United States depository for the amount of the price of' the meter, payable to the order of Mr. Tice.” * * “Upon the delivery of the meter to the distiller the collector will at once transmit the certificate of deposit to Mr. Tice, at his address, 314 Third avenue, New York City.” In the regulation of March 30,1869, these provisions were again promulgated in exactly the same language as before, except that the certificate of deposit wras required to be forwarded to Mr, Tice “ upon the receipt of the bill of lading.” Among the regulations of that date are the following instructions:
“ Under the provisions of the law the distiller is required to furnish and attach meters at his own expense, and also to- *403 furnish all pipes, materials, labor, and facilities necessary to complete such attachment. The first duty of a distiller is, of course, to procure a meter. The manufacturer is not required to furnish the meters on credit, and ought not to be expected to do so. When he ships a meter to a distiller, in accordance with the application, the manufacturer is entitled to the pay for it. The law does not require the manufacturer to attach it, but on the contrary requires the distiller to attach at his own expense.”
If, then, the regulations and instructions were obeyed, .the defendants’ officers had no money of the claimants, but they held certificates of deposit payable to Mr. Tice, and these they were required to forward to Mr. Tice as soon as the meters or the bills of lading were delivered.
Under the former law and regulations of 1867 distillers were required to deposit with the collector money or bonds as a guarantee of good faith and to secure the contractor prompt payment upon completion of the work. This plan was abandoned under the law of 1868, and the system adopted which we have pointed out.
The claimants admit in their petition that the meters for the payment of which their deposit was made arrived for their respective distilleries in December, 1868, and July, 1869, and the facts found show that those for distillery No'. 1 were delivered December 19,1868, and .those for No. 4, July 26,1869. That being the case, it was the duty of the collector at once to transmit the certificates of deposit to Mr. Tice, without waiting to have the meters attached and tested, and this he did.
• Our attention has been drawn to the circular-letter of January 8, 1869, from the Commissioner to the collectors, as follows:
“ Sm: You will forward no certificates of deposit in payment for meters delivered until the meters are attached to the distilleries, and in future you will take the certificate of deposit in your own name, changing those which have been already taken, if you can do so.”
This letter has no material application to the claimants’ case. Before it was issued the meters for distillery No. 1 had been delivered, and Mr. Tice had received or had become entitled to the certificate of deposit therefor. A month later, February 5, 1869, the Commissioner, in a circular of that date, revoked that direction to collectors, as to meters previously delivered, in *404 these words: “ Where meters had been delivered prior to the receipt of the'instructions of January 8, collectors will promptly forward to Mr. 'Tice the certificates of deposit therefor, and measures will be taken to have them attached.” And by the regulations of March 30,1869, the whole letter was superseded and the former rules re-established with more stringent directions, as we have quoted them. So, in July, 1869, when the meters for distillery No. 4 were delivered, the instruction of January 8,1869, not being in force, the collector was right in transmitting the deposit-certificate to Mr. Tice, according to the regulations then in force. The only application which the, letter of January 8 could have to the claimants’ deposits was that it required the certificate for the price of meters for distillery No. 4, applied for March 12, 1869, to be taken in the name of the collector, but that is not material, since the collector transmitted the certificate, as required by regulations and instructions, to Mr. Tice.
In the case of Sausser v. The United States, (9 C. Cls. R., 338,) the claimant’s assignor, one McGehan, in making application for a meter for his distillery, deposited with the collector money as security for payment thereof, as he was required to do under the statutes and regulations of 1867-, then in force, and took a receipt therefor. This receipt passed to his vendee and successor in the distillery. The collector misappropriated and did not account for the money, and went out of office. Subsequently, when the meter arrived, the then collector demanded payment, and refused to recognize the receipt given by his predecessor, and the claimant was compelled to pay for the meter again or have his distillery closed. The court held that the United States was liable to refund the money thus misappropriated by the first collector. But that is not this case. Here there has been no misappropriation, the claimants have received the meters applied for, they have not been compelled to procure other meters in order to carry on their business as distillers, and their distilleries have not been interfered with.
There is another fatal‘ defect in the claimants’ case. They received the meters in 1868 and 1869, and have never returned them or offered to return them, and have them now, unless they have sold them, as they might have done at any time after delivery. We cannot presume that these meters were of no merchantable value if they were perfect, and if not perfect the *405 purchasers should have returned them to the manufacturer, or notified him to remedy any defects. For two years or thereabout after their delivery such meters were required at all the distilleries in the United States, and therefore may have had a commercial value. And whether they were of any value to the claimants or not, they chose to keep them and not to return them-to the manufacturer.
It is one of the most familiar elementary principles of law that the purchaser of personal chattels who underbakes to rescind the purchase altogether, and seeks to recover back the whole consideration paid, as in this case, must return, or offer to return, the articles received by him. He cannot both keep the chattels and have his money refunded.
In the case of Sausser v. The United States, (11 C. Cls. R., 538,) we considered some of the questions which arise in this case, and now, after a full and careful reconsideration of the whole subject, we adhere to the views expressed in the opinion therein; and in this case, as we held in that, we hold that the claimants have no cause of action, and that their petition must be dismissed.