HANLON, JUDGE:
These claims arise out of two separate projects on Interstate 79 designated as Project No. 1-79-1(16)29 and Project No. 1-79-1(15)25. The projects will hereinafter be referred to as Projects (16)29 and (15)25, respectively. These projects entailed the construction of three bridges, excavation and grading, and providing drainage for Interstate 79. The two projects are adjacent to each other with Project 15(25) as the southerly project. Claimant contends that there were differing site conditions and that errors in the plans caused claimant to incur extra costs in construction of the projects in the amount of $5,994,353.74.
Claimant also alleges that it is entitled to recover $9,000.00 in liquidated damages assessed by respondent on project (15)25 for 90 days at $300 per day as claimant did not complete the project in accordance with the contract completion date. Claimant asserts that the Court previously determined this issue in J. F. Allen Co. vs. Dept. of Highways, 12 Ct.Cl. 364 (1981). In that claim, the Court made an award for liquidated damages based upon the application of the liquidated damage clause in the contract as being unjustifiable. The Court indicated that "Irrespective of Governor Moore's oral proclamation...granting a ninety-day extension to the various contractors, the Court... is of the opinion that enforcement of the liquidated damage clause in the contract was unjustifiable." Claimant herein asserts that the proclamation applies to it also and should substantiate an award for the liquidated damages assessed. The Court will treat the issue of liquidated damages in this claim de novo.
Claimant bid on the northern project designated (16)29 in March 1970 and was awarded the project. In May 1970, claimant bid on the southern project designated (15)25. Claimant desired to construct both projects as the projects were adjacent to each other. Prior to bidding the projects, representatives of the claimant walked the job sites to examine the terrain and conditions then and there existing. Claimant reviewed the mass diagram and grading summary prepared by respondent which accompanied the plans in order to determine the excavation and fills which constituted the major portion of the work. The plans indicated that these projects were waste projects meaning that there would be sufficient material in the cuts to provide the embankment *154 material for the fills. In particular, claimant noted that the mass diagrams for the projects indicated that the projects were balanced i.e. waste equalled fill. The plans also indicated the shrink/swell factors for the material to be excavated. Claimant used these factors in calculating the amount of material necessary for the fills to be constructed.
The northern project provided for the construction of two bridges with a major cut of one million cubic yards between the bridges. There was also a major fill north of the bridges and the remainder of the construction involved channel changes to the northern end of the project.
The southern project provided for the construction of a major interchange known as the Amma Interchange. There was a large cut which contained one million cubic yards of material which appeared to be an amount which would be wasted. North of this interchange, claimant was to relocate local service route 29 and relocate a creek which involved several channel changes. The plans contained a note that the topsoil was unsuitable material which meant it would be wasted. Claimant's representatives determined that the topsoil was suitable and could be used as embankment material. When claimant bid the projects, the bids were base upon the premise that claimant would not have a borrow item as there would not be a necessity for borrow.
On the northern project, claimant proceeded with the construction of the two bridges which were in close proximity to one another but separated by a large cut. The material in the cut between Bridge 2681 and Bridge 2682 had to be transported north to an area known as the "million yard fill." Temporary access areas were constructed to facilitate the moving from the excavation between the bridges. North of the million yard fill was an area known as the cemetery fill. It was impossible to haul material up into that fill due to the high elevation of the rock. Therefore, the approximately 15,000 cubic years at that location was wasted.
The projects progressed without major problems until spring of 1972. At that time, claimant began to suspect that there would not be sufficient material to complete the embankments on either project with the material that remained to be removed in the cuts. Claimant instructed its employees to calculate the amount of fill needed as compared with material in the cuts by taking cross sections of the project. In June 1982, claimant informed respondent that it would need to borrow material to complete the projects. Respondent allowed the borrowing of material, but informed claimant that respondent would not pay for this item.
The southern project was started at the Amma Interchange as claimant determined that the area was accessible and claimant could work through the winter on excavation which could be wasted. At the pre-construction conference for this job. respondent's representative noted that claimant needed to submit waste areas for approval in order to claimant to waste material. This was done and claimant proceeded to waste both suitable and unsuitable material in a large waste site north of the bridge being constructed at the Amma Interchange. Claimant was able to use approximately 250,000 cubic yards of the cut for the construction of the interchange.
*155 Claimant continued with the projects and did, in fact, borrow material to complete the embankments. Claimant excavated approximately 300,000 cubic yards of material at the common cut which claimant used on project (15)25 although the material came from project (16)29. This action was permitted by respondent, but claimant was not paid for the borrow on project (15)25. There was also material borrowed at the site of the office. However, claimant had wasted material at this site, and then found it necessary to remove the wasted material to another location in order to excavate borrow material. The work entailed additional blasting and excavation. The claimant also borrowed material at the northern end of project (16)29 where there was a shortage of material.
Claimant contends that the shortage of materials was the direct result of an error in the plans which indicated the shrink-swell factors. It is claimant's position there were errors in the shrink/swell factor of more than 10% on project (15)25 and 5% or more on project (16)29. Although permission was granted by respondent to use material excavated from the cut common with the adjoining project at stations 1510 -1517 as borrow material to complete this project, the fills were still short, and claimant required additional borrow. Borrow material was drilled and blasted, then excavated and hauled to the construction area to satisfy the embankment shortage.
Claimant relied upon these factors in calculating the amount of material needed for the embankments. Claimant also contends that the channel change material which was indicated as suitable material on the plans could not be used as it was too wet. This material was wasted. Claimant asserts that borrow would not have been needed if the plans had been correct. As a result, claimant alleges that respondent breached an implied warranty.
Respondent contends that claimant elected to waste material unnecessarily on these projects. Respondent referred to Section 207.3.4.2 of the Contract Specifications which provides: "If the contractor elects to waste rather than dry suitable replacement material, if needed to complete embankments or otherwise fulfill the intent of the plans, shall be furnished and placed by the contractor at his expense... ." Respondent alleges that sufficient material existed within the project limits to fulfill the necessary embankment quantities without requiring borrowing material from some other site. Respondent contends that claimant's overwasting, rather than an error in the shrink/swell factor, resulted in the need for borrow.
The instant case falls squarely within the reasoning of Ideker, Inc. vs. Missouri State Highway Comm'n., 654 S.W.2d 617 (1963). In Ideker, the Missouri State Highway Commission prepared plans and specifications which indicated a particular project would be a balanced job and the contractor made his bid in reliance on their representations. After the project began, the plans shrinkage factor proved incorrect and the project became a waste job.
The Court, after reviewing the cased on the subject of claims against governmental bodies involving contracts, concluded that a contractor should recover against the government entity on a cause of action ex contractu in the nature of a breach of warranty when these six elements are present:
*156 (1) A positive representation by a governmental entity,
(2) Of a material fact,
(3) Which is false or incorrect,
(4) Lack of knowledge by a contractor that the positive representation of the material fact is false or incorrect,
(5) Reliance by a contractor on the positive representation of a material fact made by the governmental entity, and
(6) Damages sustained by a contractor as a direct result of the positive representation of a material fact made by the governmental entity.
The Court, on page 621, reasoned as follows:
Courts subscribing to the theory of a cause of action ex contractu in the nature of a breach of warranty apparently were motivated by concepts of fundamental fairness. To avoid an unjust result, they refused to be circumscribed by the harshness of the doctrine of sovereign immunity and the principle of contract law that if performance is possible one is not entitled to extra compensation for unforeseen difficulties encountered. Syllogistically, where a governmental entity makes a positive representation of a material fact relied upon by a contractor in calculating its bid, which turns out to be false or incorrect after work is commenced and occasions additional expense, the contractor finds himself in the position of one who undertakes one contract but is confronted with performance of another. The governmental entity pragmatically speaking, gets the benefit of another contract. If performance thereof by the contractor entails more expense than was calculated in submitting its bid, the governmental entity should bear the added cost rather than the contractor because the former is the beneficiary of necessary but unbargained for work resulting from its positive representation of a material fact which turned out to be false or incorrect.
The claimant herein relied upon the mass diagram and the grading summary provided by the respondent as part of the bid documents. The time frame for letting bids on these particular contracts was such that a contractor would necessarily rely upon the information provided. This is certainly realistic. More importantly, the claimant relief upon the shrink-swell factors stated in the plans and these factors were inaccurate. The Court is of the opinion that the claimant has established that it is entitled to recover damages for certain of the borrow material which it placed in the construction of these projects.
*157 Claimant borrowed material originally wasted on project (16)29 for project (15)25 in the areas of the channel changes. The material was needed as claimant had wasted the material from the creek in the channel changes. These projects were to be completed in a two year time frame. Claimant used that portion of the channel change material which was suitable. However, claimant would have had to dry the material from the channel changes and then determine its suitability for the embankments. The Court is of the opinion that the claimant chose the most expeditious method, both for itself and respondent of completing the embankments. Therefore, claimant should be paid for this material as borrow on project (15)25. Claimant is also entitled to recover for the borrow placed on (16)29 at the north end where channel changes occurred from station 1645 to the end of the project.
There was a slide on project (15)25 which claimant contends was caused by an overload of material on an unstable area. The Court denies any recovery for work performed on the slide as the claimant also had the same knowledge concerning the instability of the area.
The Court has also determined that claimant is entitled to recover the $9,000.00 in liquidated damages assessed on project (15)25. The respondent did not establish that the failure to complete this project within the contract period damaged respondent. The amount of $9,000.00 shall be included by the parties in the documentation of damages.
This claim was bifurcated upon the issues of liability and damages. The Court directs the parties to submit documentation and a stipulation for damages incurred by the claimant in accordance with the provisions of this opinion.