**Billie KINSER and Clifford (Jay) Kinser, Respondents,**

v.

**Ahmed ELKADI, Appellant.**

No. 12021.

Missouri Court of Appeals, Southern District, Division One.

June 28, 1984.

Motion for Rehearing or Transfer Denied July 18, 1984.

Application to Transfer Denied Sept. 11, 1984.

B.H. Clampett, Patrick K. Roberts, Daniel, Clampett, Rittershouse, Dalton & Powell, Springfield, for appellant.

Thomas Strong, Mathew W. Placzek, John Wooddell, Strong & Placzek, P.C., Springfield, for respondents.

CROW, Judge.

Appellant ("Elkadi"), a thoracic and cardiovascular surgeon, appeals from a judgment, per jury trial, awarding Billie Kinser ("Billie") $900,000, and her husband, Clifford ("Jay"), $25,000. The Kinsers' claims were submitted to the jury on the theory that Elkadi was negligent in that he (1) performed an unnecessary "bilateral aorta-femoral bypass" surgical procedure on Billie on September 26, 1973, or (2) failed to secure an informed consent from Billie before performing the surgery. The Kinsers did not contend that the surgery itself was performed in a negligent manner.

This is the second time this appeal has been before this court. The first time, it was ordered dismissed as moot. Thereafter, on Elkadi's application, the Supreme Court of Missouri ordered the cause transferred there, Mo. Const. art. V, § 10, and, in *Kinser v. Elkadi*, 654 S.W.2d 901 (Mo. banc 1983), returned the cause to us for consideration of the appeal on the merits.

Elkadi assigns error in the denial of his motion for a directed verdict on each claim at the close of all the evidence, and the denial of his subsequent motion for judgment in accordance with his motion for directed verdicts. He also attacks certain jury instructions, the reception of certain evidence over his objection, and some comments by one of the attorneys for the Kinsers in opening statement and closing argument. Additionally, Elkadi contends a mistrial should have been declared when one of the attorneys for the Kinsers telephoned Mrs. H_____, who was, at the outset of the trial, a member of the jury. Mrs. H_____ was excused as a juror on the fifth day of trial because of her husband's illness, and the call was made two days thereafter, while the trial was still in progress.

Regarding the sufficiency of the evidence, Elkadi characterizes the trial as "nothing more than a conflict of judgment" between the medical specialists who testified for him and those who testified for the Kinsers. Arguing that his experts maintained the surgery was appropriate, and that the disclosure he made to Billie was adequate, Elkadi, citing *Haase v. Garfinkel*, 418 S.W.2d 108, 114[5] (Mo.1967), insists he was entitled to a wide range in the exercise of his judgment and discretion, and could not be found guilty of negligence unless it were shown that the course he pursued was clearly against the course recognized as correct by the medical profession generally. He asserts that as long as there is room for an honest difference of opinion among competent physicians, a physician who uses his own best judgment cannot be convicted of negligence, even though it may afterward develop that he was mistaken. *Id.* at 114[6].

The Kinsers respond that the evidence made a jury issue on both submissions of negligence, as there was testimony from their experts that Elkadi, in performing the surgery when it was unnecessary, and in giving Billie the explanation about it beforehand, failed to use the degree of skill and learning ordinarily used under the same or similar circumstances by members of his profession.

The trial consumed 14 days; the transcript exceeds 2,500 pages. Nine medical doctors (including Elkadi) testified, and there were nine other witnesses (including the Kinsers). Inasmuch as we, in gauging the sufficiency of the evidence, view it in the light most favorable to the verdicts, giving the Kinsers the benefit of all reasonable inferences therefrom, *Haswell v. Liberty Mutual Insurance Co.*, 557 S.W.2d 628, 633[1] (Mo. banc 1977), we need not summarize all the testimony, but only that which supports the result below.

Billie was 35 years old when she first saw Elkadi on September 20, 1973. Billie, according to her testimony, told Elkadi she occasionally had a "burning ache" behind her left knee when she exercised. She considered it a "minor nuisance." She added that she sometimes had a similar ache behind her right knee, but it was "almost nonexistent." Billie's testimony regarding her symptoms conflicted with Elkadi's office records of what she told him, the records reflecting more serious symptoms. Which version was true was a jury issue, and we need not detail the discrepancies.

Elkadi, acting on his version of Billie's history, together with his examination of her, suspected she was afflicted with aortoiliac occlusive disease and right carotid occlusive disease. On September 25, 1973, at Elkadi's direction, Dr. Thomas P. Sweeney, a radiologist, performed a carotid arteriogram and an abdominal aortogram with run-off studies on Billie. Elkadi, after reviewing Sweeney's report and studying the films, diagnosed that Billie had aortoiliac occlusive disease, characterized at trial as arteriosclerosis or atherosclerosis.

The arteriography had required Billie to be hospitalized, and on the evening of September 25, 1973, Elkadi visited Billie in her hospital room, explaining his diagnosis and describing how her symptoms could be relieved by surgery. There were conflicts in the testimony of Elkadi and Billie regarding what Elkadi said during the visit, but we need not recount each difference. It was the province of the jury to decide whose testimony to believe. At the end of the visit, Billie signed a consent for the surgery, and Elkadi performed it the next day.

Elkadi described the surgery as "a bypass procedure connecting the aorta to the femoral arteries using a bypass graft," made of Dacron. The procedure was designed to route the flow of blood around the area Elkadi said was significantly diseased, the lower part of the aorta and its main branches. The operation was performed without complications, and Billie was discharged from the hospital on October 5, 1973.

In November, 1976, Billie had a sudden onset of symptoms, and it was discovered that the wall of the femoral artery and the graft, where they had been sewn together, had disrupted, allowing blood to leak and causing a clot to block off the graft and the artery to which the graft was hooked. Dr. Thomas E. Ashley performed repair surgery, removing the clot and repairing the disruption between the graft and the artery, installing a new suture line.

In September, 1977, Billie experienced pain in her left leg and numbness of her left foot, leading to the discovery that the same side of the graft was blocked again. Ashley once more undertook repair surgery, but this time the condition of the arteries was such that he believed he should not "try to again hook this graft in, which on two occasions in less than a year had formed a false aneurysm." Ashley took a segment of the saphenous vein from Billie's left thigh and made a new blood vessel similar to the graft, hooked it to Billie's superficial femoral artery and bypassed the clotted area.

Dr. Phillip Carr, "board certified" in internal medicine and cardiovascular disease, had examined Billie the day before her 1976 surgery. While Billie was hospitalized for her 1977 surgery, Jay asked Carr whether the 1973 surgery should have been done. Carr, who had "reviewed all of the situation," responded, "No, I don't believe the operation should have been done, Mr. Kinser." This suit was filed a few months later.

The test for negligence in this case is whether Elkadi, in the respects complained of by the Kinsers, failed to use that degree of skill and learning ordinarily used under the same or similar circumstances by the members of his profession. *Gridley v. Johnson*, 476 S.W.2d 475, 481–83[5] (Mo. 1972); MAI 11.06 [1978 Revision]. Because both submissions of negligence involve issues of medical expertise beyond the common knowledge or experience of laymen, the Kinsers were obliged to

present expert medical testimony that Elkadi, as to each submission, failed to meet the required standard. *Haase*, 418 S.W.2d at 112–14; *Aiken v. Clary*, 396 S.W.2d 668, 673–75 (Mo.1965). Presentation of such testimony makes a submissible case, and once such testimony is presented, the ultimate determination whether Elkadi, in either or both respects submitted, was negligent, becomes a jury question. *Aiken*, 396 S.W.2d at 675[5]. If such testimony be lacking regarding either assignment of negligence, the verdicts cannot stand. *Cook v. Cox*, 478 S.W.2d 678, 680[2] (Mo. 1972); *Miller v. Scholl*, 594 S.W.2d 324, 328[1] (Mo.App.1980).

The dispute between the Kinsers' medical experts and Elkadi and his experts centered around whether, and to what extent, Billie was afflicted with arteriosclerosis in 1973, and whether the surgery Elkadi performed was necessary or appropriate at that time. Because we need decide only whether the Kinsers fulfilled their obligation of presenting expert testimony that Elkadi, as to both grounds submitted, was negligent, it is unnecessary to recount the opinions of all nine physicians.

The Kinsers rely primarily on the testimony of Dr. Carr to sustain their position. His testimony fills 227 pages of the transcript, and is punctuated by objections, interruptions, rephrased questions, narrative answers, clarifications, arguments of counsel, bench conferences, and other flotsam of a hard fought trial.

■ Without undertaking to quote or paraphrase everything Carr said pertinent to the submissions of negligence, we hold that his testimony, cast in the light most favorable to the Kinsers and giving them the benefit of all reasonable inferences, *Haswell*, 557 S.W.2d at 633[1], expresses the opinion that Elkadi, in performing the 1973 surgery, and in telling Billie about her condition and why the surgery should be performed,[1] failed to use the degree of skill and learning ordinarily used under the same or similar circumstances by members of his profession. Carr's testimony therefore made a submissible case for the Kinsers, and it was the jury's province to weigh Carr's testimony and that of the other doctors in deciding whether Elkadi was negligent. As Carr's testimony is sufficient to support the verdicts, it is unnecessary to decide whether the testimony of any of the other medical experts is similarly adequate. We note, though, that the questions asked them on the negligence issues were, in the main, phrased in terms of what a "prudent" doctor would, or would not, have done. Without deciding the question, it appears to us that an argument can be made that failure to do what a prudent doctor would have done is not synonymous with failure to use that degree of skill and learning ordinarily used under the same or similar circumstances by the members of his profession.[2] We leave that, however, to await a case where it must be decided.

Inasmuch as the Kinsers made a submissible case with Carr's testimony, Elkadi's first point fails.

Turning to Elkadi's attacks on the jury instructions, we note, as observed earlier, that Billie's claim and Jay's claim rested on identical theories. Instruction 10, footnoted below,[3] submitted Billie's claim; Instruc-

---

1. With respect to what Elkadi told Billie before the surgery, we have noted earlier that it was for the jury to decide whether Elkadi's version or Billie's version was true. As Billie's version was more favorable to the Kinsers than Elkadi's, her version was the one to be measured by the applicable standard of negligence.

2. Testimony from a medical expert that the surgery performed on a plaintiff was not up to acceptable medical standards as he knew them was held insufficient to submit the question of

negligence to a jury in *Swope v. Printz*, 468 S.W.2d 34, 40[12] (Mo.1971).

3. Instruction 10 (MAI 21.01 [1965 New], modified) provided, in pertinent part:
 "Your verdict must be for plaintiff Billie Kinser and against defendant if you believe:
 First, either:
 defendant performed unnecessary surgery on Billie Kinser, or
 defendant failed to secure an informed consent from Billie Kinser before performing the surgery, and

tion 13[4] submitted Jay's.

"Unnecessary surgery" was defined in Instruction 6—not in MAI—as "surgery which a doctor (using that degree of skill and learning ordinarily used under the same or similar circumstances by members of defendant's profession) would have refused to perform even though the patient consented to it." Elkadi asserts the trial court erred in giving Instruction 6 because it "failed to frame the precise factual issue(s) that the jury was required to decide and was confusing and misleading." Elkadi does not identify the factual issues that Instruction 6 should have framed, apparently trusting us to recognize them.

The flaw in Elkadi's challenge of Instruction 6 is that the criticism he expresses here does not appear in his motion for new trial.[5] There, he attacked Instruction 6 on the ground that it was "in effect, a definition of negligence, not of surgery," and, when considered with the instruction defining negligence, "unduly emphasized the terms negligent and negligence." That complaint in nowise constitutes an assertion that the instruction fails to frame "precise factual issues," whatever they be.

Rule 70.03,[6] as pertinent here, provides, in part, that "[s]pecific objections to instructions shall be required in motions for new trial unless made at trial."

 Elkadi voiced no specific objection to any of the instructions at trial, merely objecting "generally" to each instruction given. Because the contention Elkadi makes on appeal was made neither at trial nor in his motion for new trial, it has not been preserved for appellate review and will not be considered here for the first time. *Bower v. Hog Builders, Inc.*, 461 S.W.2d 784, 797–98 (Mo.1970); *Ideker, Inc.*

*v. Missouri State Highway Commission,* 654 S.W.2d 617, 623–24 (Mo.App.1983).

Evidently cognizant of this barrier, Elkadi argues that the assignment of error was preserved by an allegation in his motion for new trial that Instruction 6 "departed from the mandatory form, format, requirements and practice of MAI and was confusing and misleading to the jury." That allegation, however, ignores the point Elkadi seeks to raise here, and consists of nothing more than raw, abstract conclusions of law, which do not meet the test of specificity and, therefore, preserve nothing for appellate review. *Ideker,* 654 S.W.2d at 623[4]; *Associated Underwriters, Inc. v. Mercantile Trust Co.,* 576 S.W.2d 343, 346[2] (Mo. App.1978).

Elkadi also attacks Instruction 6 by arguing that it (a) should have defined unnecessary surgery as surgery so palpably unnecessary that a surgeon of ordinary care and prudence would not have advised or undertaken it, (b) erroneously applied a "single member of the profession test" and excluded the "respectable minority test," and (c) was argumentative, confusing and misleading because it included the phrase "even though the patient consented to it." What merit, if any there be, in these assignments of error need not be excogitated, as none of them were asserted at trial or in the motion for new trial. Consequently, they are not cognizable here. *Bower,* 461 S.W.2d at 797–98; *Ideker,* 654 S.W.2d at 623–24.

Elkadi's attack on Instructions 10 and 13,[7] the verdict directing instructions on Billie's claim and Jay's claim, respectively, meets the same fate. Elkadi argues that the trial court erred in giving those instructions because they were not supported by the evidence, in that there was a failure of

---

Second, defendant's conduct in one or both of the respects submitted in paragraph First, was negligent, and
. . . . ."

**4.** Instruction 13 was identical to Instruction 10 insofar as that portion of Instruction 10 quoted in footnote 3, *supra,* is concerned, except that in Instruction 13, the name "Jay" appeared instead of the name "Billie" in the first line.

**5.** Elkadi filed a separate motion for new trial as to each claim. When we refer to his motion for new trial, we mean both motions.

**6.** Rule references are to Missouri Rules of Civil Procedure (11th ed.1980).

**7.** Footnotes 3 and 4, *supra.*

proof of one element of the tort, namely, that a reasonably prudent person, if adequately informed, would not have submitted to the proposed treatment. We have searched the motion for new trial, but have found no such assignment of error. Further, as previously observed, there was no specific objection at trial to any instruction. The point is therefore ineligible for consideration. *Bower,* 461 S.W.2d at 797–98; *Ideker,* 654 S.W.2d at 623–24.

We next consider Instruction 7, not in MAI, which defined "informed consent" as "a consent obtained after having used that degree of skill and learning ordinarily used under the same or similar circumstances by members of defendant's profession to inform the patient of the foreseeable risks incident to, and the existence and feasibility of possible alternatives to, the proposed surgery." Elkadi asserts the trial court erred in giving Instruction 7 because it failed to follow the applicable substantive law, in that the hypothesized disclosure included the foreseeable risks incident to, and the existence and feasibility of possible alternatives to, the proposed surgery. Elkadi argues that the law requires only such disclosure as a reasonable medical practitioner would make, taking into account such things as the patient's health and mental state, the condition of the patient's heart and nervous system, and whether the risks were remote possibilities or something which occurred with some sort of frequency and regularity. He argues that the instruction required him to disclose *all* foreseeable risks and possible alternatives, of whatever significance or magnitude.

■ We do not read Instruction 7 that way. In our opinion, the instruction permits the jury to find Elkadi negligent only if he failed to inform Billie of the foreseeable risks and possible alternatives that a physician using the degree of skill and learning ordinarily used under the same or similar circumstances by members of his profession would have told her about. That is the proper test for negligence on the informed consent issue. *Aiken,* 396 S.W.2d at 673–75. There being no applica-

ble MAI instruction, we hold the trial court did not err in giving Instruction 7.

The next assignment of error that we consider arises from the Kinsers' use of certain portions of the deposition of Dr. Walter Ford Keitzer. As part of their case, the Kinsers read to the jury excerpts from Keitzer's deposition regarding (a) Elkadi's background, experience and training, (b) the significance and credibility of the symptoms Billie initially reported to Elkadi, (c) the advice Keitzer would have given Billie on the basis of those symptoms, (d) the follow-up examinations Keitzer would have made, (e) the likelihood of improvement by patients with symptoms like Billie's (f) the number of patients under age 35 on whom Keitzer had performed aorta-femoral bypass surgery because of arteriosclerosis, and (g) the life expectancy of the vein bypass and a Dacron graft.

Later, the Kinsers presented the testimony of Dr. Sweeney, who had done the 1973 arteriography. The Kinsers' attorney showed Sweeney the films of Billie's carotid arteries and told him to assume that Keitzer "has said that he has found an abnormality there." The Kinsers' attorney thereafter asked Sweeney to explain "this little shadow or this little white spot over here," whereupon Elkadi's attorney objected on the ground that if the purpose of the question was to impeach Keitzer, "who is plaintiffs' witness, plaintiff cannot impeach his own witness." The Kinsers' attorney replied that Keitzer was not their witness on the subject inquired about. The trial court overruled the objection, and Sweeney testified, in substance, that there was no arteriosclerosis shown at the location under scrutiny.

Elkadi argues on appeal that the Kinsers, by using portions of Keitzer's deposition in their case, made him their witness. Consequently, says Elkadi, the trial court erred in permitting the Kinsers to discredit or impeach Keitzer, through the testimony of Sweeney, "on the critical and disputed factual issue of what (and how much) disease was shown by the various x-rays."

In analyzing this point, we note that at the time the objection was made, neither side had offered anything from Keitzer's deposition regarding what was shown in Billie's 1973 carotid arteriogram. Obviously, therefore, nothing that Sweeney said on that subject, at that point in the trial, could have conflicted with anything the jury had heard from Keitzer.

Later in the trial, during Elkadi's case, Keitzer was called as a witness by Elkadi, and testified in person. His testimony fills 213 pages in the transcript. As Elkadi nowhere identifies the testimony of Keitzer that was allegedly contrary to Sweeney's, we have seined the record in an effort to pin down Elkadi's complaint. We have located one point where Keitzer testified that "in the light of information we have today, in 1980," there is "a strong suggestion of an abnormality on that right carotid arteriogram." Keitzer directed the jury's attention to an area where "you can see a little something going on," and he pointed out other similar irregularities. Later, on cross-examination, Keitzer, as we understand the testimony, said he would have interpreted the carotid angiograms as normal in 1973, "just as they were interpreted by the angiographer here in Springfield."

If we comprehend Keitzer's testimony, he is saying, in esse, that had he seen the carotid arteriogram in 1973, he would, at that time, have interpreted it the same as Sweeney, but with the enhanced medical knowledge he had by 1980, he was able to discern certain abnormalities indicating disease.

Hoping we have correctly assembled and interpreted the testimony on which this point rests, we now examine it for merit.

Reduced to essentials, Elkadi's argument is that because the Kinsers presented testimony by Keitzer on certain subjects, they should not have been allowed to present testimony by Sweeney, on a different subject, that was inconsistent with the opinion Keitzer was known to possess on that subject, even though Keitzer's opinion on that subject was not then before the jury.

We believe the point is ruled by the principle that a party may contradict his own witness by independent evidence showing facts to be different than those testified to by such witness, *Waldrip v. American Buslines, Inc.*, 327 S.W.2d 211, 215[3] (Mo.1959), or, expressed another way, evidence relevant to the issues may not be excluded because it contradicts another witness called by the same party, whether such witness be friendly or hostile, *Talley v. Richart*, 353 Mo. 912, 185 S.W.2d 23, 26[7] (1945). Therefore, even if Keitzer be considered the Kinsers' witness as to all his testimony—a matter we need not decide —Sweeney's testimony was properly received. As Sweeney's testimony did not contradict anything that the Kinsers presented from Keitzer, and, at most, was in conflict only with what Keitzer said later when he was called as a witness by Elkadi during the latter's case, it is clear under *Waldrip* and *Talley* that there was no error in admitting Sweeney's testimony.

*Conner v. Neiswender*, 360 Mo. 1074, 232 S.W.2d 469 (1950), the sole case relied on by Elkadi, is inapposite. There, a plaintiff suing for damages for personal injuries presented, as part of his evidence, the deposition testimony of physicians who had examined him at the instance of the defendant's liability insurer. The plaintiff sought to read to the jury those parts of the depositions disclosing who had employed the physicians, but, on the objection of the defendant, was prevented from doing so. In upholding the ruling, the Supreme Court noted that the plaintiff was seeking to discredit the witnesses he had presented by showing their bias in favor of the defendant, thereby endeavoring to increase the value of their testimony to himself. *Id.* 232 S.W.2d at 474. This offended the general rule that, subject to certain exceptions, a party may not directly discredit or impeach his own witness. *Id.* 232 S.W.2d at 473[9].

Pertinent to the instant case, we point out that impeachment and contradiction are not synonymous. Impeachment is directed to the credibility of the witness for

the purpose of discrediting him. *Talley*, 185 S.W.2d at 26. Nothing in Sweeney's testimony impugned Keitzer's credibility or discredited him. Elkadi's point, though adroitly raised, is without merit.

We move now to Elkadi's assertion that the trial court erred in allowing Billie to testify that Elkadi failed to adequately inform her of the risks and complications of the surgery and possible alternative methods of treatment. Elkadi insists this testimony violated the parol evidence rule, inasmuch as the "Request and Consent Form" Billie signed the night before the surgery stated that the "nature and purpose of the operation, the possible alternative methods of treatment, and the principal risks and complications of this operation have been explained to me."

Over Elkadi's objection, the trial court allowed Billie to testify that Elkadi did not tell her that the surgery might shorten her life, that he said nothing about the life expectancy of the Dacron graft, and that he told her nothing about possible alternatives to the surgery.

Neither side cites a case deciding whether the parol evidence rule applies to a factual statement in an instrument by which a patient manifests consent to undergo medical treatment, and our research has failed to uncover one. Consequently, we examine the rule itself for a clue as to whether it should apply.

Texts express the rule in various ways. 32A C.J.S. *Evidence* § 851 (1964) says:

"It is a general rule that parol or extrinsic evidence is not admissible to add to, subtract from, vary, or contradict judicial or official records or documents, or written instruments which dispose of property, or are contractual in nature and which are valid, complete, unambiguous, and unaffected by accident or mistake. This rule, which is known as the parol evidence rule, is one of substantive law and not merely one of evidence; and it obtains in equity as well as at law."

Other definitions appear in 4 Williston on Contracts § 631 (3d ed.1961) and 3 Corbin on Contracts § 573 (1960).

It is clear that not all writings come within the scope of the parol evidence rule. Generally, the rule applies only to jural acts, and only where enforcement of an obligation created by the writing is substantially the cause of action. 32A C.J.S. *Evidence* § 928 (1964). A writing which does not vest, pass or extinguish any right either by contract, operation of law, or otherwise, and which is used as evidence of a fact rather than as evidence of a contract or right, may be susceptible of explanation by extrinsic circumstances or facts. *Id.*

Elkadi cites two cases, *Craig v. Jo B. Gardner, Inc.*, 586 S.W.2d 316 (Mo. banc 1979), and *Haggard v. Mid-States Metal Lines, Inc.*, 591 S.W.2d 71 (Mo.App.1979). In the former, the parol evidence rule was held to preclude the use of extrinsic evidence to vary or contradict the terms of an unambiguous and complete written contract absent fraud, common mistake, accident or erroneous omission; in the latter, the cause of action was based on misrepresentations by which a contract was induced, and the rule was held not to prohibit extrinsic evidence of statements by one of the parties regarding certain items covered by the contract.

In *Wind v. Bank of Maplewood & Trust Co.*, 58 S.W.2d 332 (Mo.App.1933), the plaintiff bought four bonds from the defendant, the latter preparing documents that were, in effect, bills of sale. Later, the plaintiff sued to recover what he had paid, basing his claim on an alleged oral agreement that the defendant would repurchase the bonds if he, the plaintiff, ever became dissatisfied or wanted his money back. The defendant argued that because no such agreement appeared in the bills of sale, the parol evidence rule barred the plaintiff from testifying about one. Rejecting that contention, the Court of Appeals held there was nothing contractual about the bills of sale, as they recited no mutual obligations of the parties. The bills of sale were simply evidence of the transaction, therefore the introduction of the plaintiff's testimony regarding the buy-back agree-

ment was not violative of the parol evidence rule. *Id.* at 334–35.

In *McGinnis v. Aetna Life Insurance Co.,* 78 S.W.2d 501 (Mo.App.1934), extrinsic evidence explaining certain entries on an application by a policyholder for an extension of time within which to pay a premium was held admissible over an objection that it violated the parol evidence rule. The Court of Appeals noted that the application did not purport to be a contract or a receipt, but even though it could be construed as a receipt, it would nevertheless have been subject to explanation by parol evidence. *Id.* at 507.

■ These authorities convince us that Billie's testimony regarding what Elkadi told her—and failed to tell her—the night before he performed the surgery, did not offend the parol evidence rule. We pointed out earlier that it was Elkadi's duty to inform Billie of the risks and alternatives that a physician using that degree of skill and learning ordinarily used under the same or similar circumstances by the members of his profession would have told her about. That was a duty imposed by law, not created by the consent form. The form neither proved the duty nor excused Elkadi from fulfilling it. The form merely supplied evidence on the fact issue of what information Elkadi gave Billie. In these circumstances, the parol evidence rule was not activated; consequently, the form was not immune from contradiction by Billie's testimony. The trial court ruled correctly.

We next consider two assignments of error regarding comments by one of the Kinsers' attorneys in opening statement and closing argument.

In opening statement, on June 24, 1980, the attorney said, "Although he [Elkadi] practiced in Springfield four and a half years, there won't be a single doctor from Springfield, Missouri who will say that what he did was right." Elkadi objected, asked that the jury be instructed to disregard the comment, and moved for a mistrial. The trial court sustained the objection, ordered the comment stricken, and

instructed the jury to disregard it. The request for mistrial was denied.

During closing argument, on July 10, 1980, the Kinsers' attorney said, "And I think your common sense would tell you that in the normal situation, if a suit were brought against a doctor in Springfield, Missouri, who practiced in Springfield, Missouri, other Springfield doctors would flock to his aid." Elkadi objected, asked that the jury be told to disregard the comment, and moved for a mistrial. The trial court sustained the objection, ordered the comment stricken, and instructed the jury to disregard it. The motion for mistrial was denied.

Elkadi, citing *Gridley,* 476 S.W.2d 475, and *Hill v. Boles,* 583 S.W.2d 141 (Mo. banc 1979), argues that the trial court erred in denying each motion for mistrial. Elkadi maintains the statements were improper in that they amounted to a comment on his failure to produce equally available witnesses, and that they were not supported by any evidence either as to the direct statements about Springfield doctors or as to the implications that all Springfield doctors were acquainted with the Kinser case and all of them had opinions about it that were unfavorable to him.

In weighing these contentions, we observe that the instant case is unlike *Gridley* and *Hill,* on which Elkadi relies. Those cases held it was error to allow the defendants to argue that the jury could draw unfavorable inferences from the failure of the plaintiffs to call as witnesses certain physicians who had treated them. That was not the situation here, as there was no argument by the Kinsers' attorney that the jury could draw an unfavorable inference from Elkadi's failure to call as a witness any doctor who had examined or treated Billie. Additionally, unlike *Gridley* and *Hill,* the trial court here sustained Elkadi's objections to the offending comments, ordered them stricken, and instructed the jury to disregard them. Thus, we need decide only whether the trial court committed reversible error in refusing to declare a mistrial. That will be addressed in connec-

tion with an allied point, to which we now proceed.

In the allied point, Elkadi complains about comments in the Kinsers' closing argument regarding "hospital restrictions" that he was under during part of the time he practiced medicine in Springfield. The factual underpinning for this point was furnished by Elkadi's testimony, on cross-examination, that when he came to Springfield in 1972, he was on the staff of two Springfield hospitals, St. John's Regional Health Center ("St. John's") and Lester E. Cox Medical Center ("Cox").

Elkadi explained that in 1972 and 1973, he was permitted to do surgical procedures at St. John's including hiatal hernia operations, gastroscopies and carotid endarterectomies. In 1974, St. John's permitted him to do any surgical procedure on the chest organs or on the cardiovascular system, but he was not permitted to do any operation on the stomach, bowels, liver, bones, brain or eyes, nor was he permitted to do hiatal hernia operations or gastroscopies. Beginning in 1973 or 1974 he was required to have a consultation before performing carotid endarterectomies, a condition that had not been specified in 1972.

At Cox, Elkadi was allowed to perform chest and cardiovascular surgery in 1972, along with hiatal hernia operations without consultation. He also performed carotid endarterectomies in 1972 and 1973, some without consultation. After 1974, Elkadi was required to have consultation before performing hiatal hernia surgery and carotid endarterectomies.

Elkadi does not assign error in the admission of the evidence about the hospital restrictions; he complains only about the way in which the Kinsers' attorney argued that evidence. The gist of counsel's argument was that when Elkadi came to Springfield, he was welcomed by the hospitals and given full privileges for surgery, but that in approximately two years St. John's "changed what he could do in that hospital." Elkadi objected and moved for a mistrial. The trial court sustained the objection, ordered the argument stricken, and

instructed the jury to disregard it. The motion for mistrial was denied.

The argument resumed with the Kinsers' attorney reminding the jury of the surgical procedures Elkadi was permitted to perform when he came to Springfield. Counsel continued, "In 1974, approximately two years later, he was prohibited—he was not permitted to perform two of those procedures, he could perform the third procedure only with a consultant." Elkadi objected, asked that the jury be instructed to disregard the argument, and renewed his motion for mistrial. The trial court sustained the objection, ordered the argument stricken, and instructed the jury to disregard it. The motion for mistrial was denied.

Elkadi emphasizes that the trial court had ruled during the trial that the hospital restrictions could be argued only as a circumstance affecting Elkadi's credentials as an expert witness. His point, as we understand it, is that the argument by the Kinsers' attorney transgressed that restriction, in that it invited the jury to speculate as to why Elkadi's hospital privileges had been restricted.

■ We agree with the trial court that the privileges a hospital grants a physician to practice in certain fields of medicine or perform certain surgical procedures are legitimate subjects of inquiry when the physician testifies as an expert witness. The existence, or absence, of hospital privileges in the locale where the physician practices bears on his professional expertise, as do his education, licensing, certifications, experience, and the like. See *French v. Brodsky*, 521 S.W.2d 670, 675[4] (Tex.Civ. App.1975). The dispute is whether the Kinsers' attorney misused the hospital restrictions in his argument and, if so, whether his comments were so prejudicial that the trial court erred in refusing to declare a mistrial.

■ In Missouri, in cases of improper argument in the course of a trial, the necessity of the drastic remedy of a mistrial is a matter resting in the sound discretion

of the trial court and, absent a manifest abuse of that discretion, an appellate court should not interfere. *Hoene v. Associated Dry Goods Corp.*, 487 S.W.2d 479, 485[11] (Mo.1972).

█ In deciding whether the trial court abused its discretion in denying Elkadi's requests for mistrials in the instances complained of, we note that the comment by the Kinsers' attorney in opening statement that no Springfield doctor would say that what Elkadi did was right was factually accurate. Five Springfield physicians testified, and the testimony of each, in varying degree, supported the Kinsers. The three physicians called as witnesses by Elkadi resided in Columbia, Missouri, Dallas, Texas, and Houston, Texas, respectively. Elkadi, at time of trial, resided near Panama City, Florida.

The comment that doctors normally flock to the aid of a local physician who is sued for malpractice, while unsupported by anything in the record, was not, in our view, so prejudicial that we can say with assurance that the trial court abused its discretion in denying a mistrial, particularly when considered in light of the length of the trial, the time span between that comment and the one in opening statement, and the mountain of evidence and argument that the jury heard.

As to the "hospital restrictions" comments, it is arguable, depending on how one interprets them, that the Kinsers' attorney did not exceed the limits imposed by the trial court, but even if he did, we fail to see how the comments were so prejudicial as to demand a mistrial.

In all of the instances discussed in these two points, Elkadi's objections were sustained, the comments of the Kinsers' attorney were ordered stricken, and the jury was instructed to disregard them. The able and experienced trial judge, who was in a better position than us to gauge the impact of the comments, determined that the relief granted was all that was required, and we are not persuaded that, in so deciding, the trial judge abused his dis-

cretion. The assignments of error are denied.

The final item to be addressed is the telephone call by one of the Kinsers' attorneys to Mrs. H_____. She was at home on Sunday morning, June 29, 1980, getting her children ready for Sunday School, when the call came. Mrs. H_____, it will be recalled, had been a member of the jury when the trial started, but she was replaced by an alternate juror on June 27 because of her husband's illness. The trial was in recess, but not finished, on the day of the call.

Mrs. H_____ was surprised by the call and "didn't think that it was the right thing to do." As a result, she reported the call to the trial court the following day and, at the court's invitation, came to the courthouse to testify about what occurred.

Mrs. H_____ explained that the attorney asked whether she had formed any opinions about the outcome of the case, whether she had any idea of what amount would be awarded, and what she thought of some of the witnesses. Mrs. H_____ told the attorney that if she ever had any problems that fell in Dr. Carr's line, she would "look him up." The attorney also asked whether the medical evidence was boring, and Mrs. H_____ replied that she found it very interesting. She added that she had formed no opinion on the issue of liability, and that while she was a juror, she had overheard no discussion by other jurors regarding the evidence.

Elkadi, conceding the absence of any reported case on the point, argues that the call (1) violated MAI 2.01 [1978 Revision], and (2) gave the Kinsers "insights into the case" that deprived him of a fair trial.

█ Inasmuch as Mrs. H_____ was no longer a member of the jury at the time of the call, we reject Elkadi's assertion that the call violated MAI 2.01. We are likewise unconvinced that the call deprived Elkadi of a fair trial. Elkadi makes no contention that Mrs. H_____ had any contact with the jurors after the call, or that she influenced the outcome of the trial in

any way. Her role in the trial had ceased, and the verdicts were untainted by any input from her thereafter. The only possible consequence of the call was that the Kinsers' attorneys might have altered their strategy or tactics as a result of Mrs. H_____'s impressions. That affords no basis for overturning the judgment.

In denying Elkadi's point, however, we do not endorse what the Kinsers' counsel did. Those who serve on juries do so under compulsion of summons, often at considerable inconvenience and hardship. They are not volunteers. When released by the court, they should be free to resume their own pursuits, without being bothered by lawyers. Even though we find no statute or rule that forbade the Kinsers' attorney from phoning Mrs. H_____ when he did,[8] we believe it is poor public relations for the judicial branch of government when a former juror is disturbed at home on a Sunday morning while minding her own business and tending to her own obligations. It is evident that Mrs. H_____ was peeved by the call. She reported it to the trial court, then was further incommoded by returning to the courthouse for the hearing. The incident was an embarrassment. We commend the trial judge for the finesse with which he handled it.

Judgment affirmed.

GREENE, C.J., FLANIGAN, P.J., and TITUS, J., concur.

---

**8.** Rule 4, Code of Professional Responsibility, DR 7–108(D) provides:

"After discharge of the jury from further consideration of a case with which the lawyer was connected, the lawyer shall not ask questions of or make comments to a member of that jury that are calculated merely to harass or embarrass the juror or to influence his actions in future jury service."

Nothing the attorney said to Mrs. H_____ was of that character.