IDEKER, INCORPORATED, a Missouri Corporation, Respondent,

v.

MISSOURI STATE HIGHWAY COMMISSION, Appellant.

No. WD 32834.

Missouri Court of Appeals, Western District.

April 12, 1983.

Motion For Rehearing and/or Transfer to Supreme Court Denied May 31, 1983.

Bruce A. King, Chief Counsel, Curtis F. Thompson, Dan Pritchard, Asst. Counsel, Missouri Highway and Transp. Com'n, Jefferson City, for appellant.

R.W. Miller, Kevin E. Glynn, Miller & Glynn, Kansas City, for respondent.

Before SOMERVILLE, C.J., and DIXON and SHANGLER, JJ.

SOMERVILLE, Chief Judge.

The Missouri State Highway Commission (Commission) has appealed from a judgment returned against it in favor of Ideker Incorporated (Ideker) for damages in the sum of Two Hundred Eighty Seven Thousand Seven Hundred One Dollars ($287,-701.00).

The nature of Ideker's cause of action and the points relied on by the Commission on appeal, for sake of clarity and comprehensibility, will be prefaced by a statement of the facts and a review of cases from which Ideker's cause of action is derived.

Ideker, a "highway contractor", was successful bidder on a construction project let by the Commission on I-35 in Harrison County, Missouri. Plans and specifications for the project were prepared by the Commission and relied on by Ideker in calculating and submitting its bid. The plans and specifications, along with the bid proposal, and Standard Specifications promulgated by the Commission, were incorporated by reference in the formal contract executed by the parties.

According to Ideker's president, the plans prepared by the Commission disclosed to those familiar with highway construction plans that the project was a "balanced" job in the sense that the profile of the grade of the highway to be constructed was designed so that excavated material removed from high spots ("cuts") in the right of way could be deposited and contained in low spots ("fills") in the right of way. Concomitantly, as a "balanced" project said plans reflected a "shrinkage" factor of 1.28.[1]

"Cuts" and "fills" were segregated in twenty one (21) designated areas on the plans, each known and referred to as a "balance". The term "balanced" job connoted a project where all excavated material removed from the "cuts" in a "balance" could be accommodated in the "fills" in a "balance" to achieve the grade profile called for by the plans prepared by the Commission.

---

1. The "shrinkage" factor X the volume of a "fill" = the volume of a "cut".

When excavated material removed from "cuts" exceeds that which can be accommodated by the "fills" in a balance, the excess material is referred to as "waste" and must be removed and disposed of, that is "wasted", at some site other than the "fills" in the balance. The plans prepared by the Commission did not provide for any "waste" disposal areas as the project was designed by the Commission as a "balanced" job. According to the Commission's own witnesses, the project was "designed" and "intended" to be a "balanced" job on the basis of a shrinkage factor of 1.28 used by the Commission in preparing the plans. Under all the evidence, both that of Ideker and the Commission, it stands undisputed that the plans prepared by the Commission were "designed" and "intended", and did, disclose that the project was a "balanced" job. As previously noted, Ideker, in reliance upon the plans prepared by the Commission, calculated and submitted its bid on the basis of a "balanced" job.

Shortly after commencing work on the project it became apparent that the "fills" would not hold the excavated material removed from the "cuts" and considerable "waste" was regularly encountered thereafter which had to be "wasted" at sites other than the "fills". The Commission's own witnesses testified that the abnormal amount of "waste" encountered after construction commenced, prompted the Commission to make several changes in grade to help alleviate the "waste" problem. Notwithstanding certain changes in grade made by the Commission, voluminous amounts of "waste" continued to plague the construction project. According to the Commission's own estimate, completion of the project resulted in 355,937 cubic yards of "waste" which had to be disposed of by Ideker. In retrospect, the shrinkage factor for the excavated material was 1.13 as opposed to 1.28, thus accounting for the vast amount of "waste" which confronted Ideker. Anomalously, no evidence was offered as to the composition of the excavated material to account for the discrepancy in the shrinkage factor utilized by the Commission in designing the project. Nor was there any evidence that Ideker, prior to starting work on the project, had knowledge of the composition of the material to be excavated or that the project was not a "balanced" job as reflected by the plans prepared by the Commission.

It stands undisputed that Ideker was paid at the contract rate (40½ cents per cubic yard) for all material excavated from the "cuts" on the project. Ideker's claim for damages, however, is predicated upon additional costs which it incurred in disposing of the "waste", that is the surplus material removed from the "cuts" which could not be accomodated in the "fills". It relied principally upon an expert witness to prove up its damages.

Bit by bit, piece by piece, as gleaned from Ideker's petition, the course of its evidence, its verdict director, and its brief on appeal, this court concludes that Ideker's cause of action was ex contractu—in the nature of breach of warranty (a positive representation by the Commission that the project was a "balanced" job). Unfortunately, from the very outset of this litigation both parties encountered considerable difficulty in perceiving the true nature and elements of such a cause of action. This bilateral difficulty injected considerable confusion at the trial level which, unfortunately, spilled over at the appellate level.

It is important throughout to bear in mind that the parties to the contract were a *governmental entity* on the one hand and a *private contractor* on the other hand, and that the project, reflected in detail on the plans prepared by the governmental entity and relied on by the private contractor in calculating its bid, was "designed" and "intended" to be a "balanced" job, a material fact which subsequently turned out to be false or incorrect. Although occupying a rather narrow niche in the vast body of case law, a cause of action ex contractu in the nature of breach of warranty under comparable circumstances has been recognized in an established line of cases. The following represent a random selection of cases from other jurisdictions espousing the theory of a cause of action ex contractu in the nature

of a breach of warranty under facts analogous to those presented by the instant case. *Christie v. United States,* 237 U.S. 234, 35 S.Ct. 565, 59 L.Ed. 933 (1915); *Hollerbach v. United States,* 233 U.S. 165, 34 S.Ct. 553, 58 L.Ed. 898 (1914); *Souza & McCue Construction Co. v. Superior Court,* 57 Cal.2d 508, 370 P.2d 338, 20 Cal.Rptr. 634 (1962); *Alpert v. Commonwealth,* 357 Mass. 306, 258 N.E.2d 755 (1970); and *Peter Salvucci & Sons, Inc. v. State,* 110 N.Y. 136, 268 A.2d 899 (1970). Missouri falls in rank with these cases as evidenced by *Bernard McMenamy, Etc. v. Missouri State Highway Commission,* 582 S.W.2d 305 (Mo.App.1979).

█ The majority of cases heretofore cited address the general subject of a cause of action ex contractu in the nature of a breach of warranty in broad general terms with random emphasis on some but not necessarily all of the elements of such a cause of action. Nevertheless, as garnered from a composite reading of all of said cases, particularly *Christie v. United States,* supra, six elements are discerned as necessary to constitute a cause of action ex contractu in the nature of a breach of warranty by a contractor against a governmental entity premised on a positive representation of a material fact:

(1) A positive representation by a governmental entity,

(2) Of a material fact,

(3) Which is false or incorrect,

(4) Lack of knowledge by a contractor that the positive representation of the material fact is false or incorrect,

(5) Reliance by a contractor on the positive representation of a material fact made by the governmental entity, and

(6) Damages sustained by a contractor as a direct result of the positive representation of a material fact made by the governmental entity.

During its embryonic stage, two troublesome principles frequently surfaced which had to be reconciled by the courts. The first being that since damages were sought in connection with work performed on a public project under a contract with a governmental entity, the party sought to be held liable, the doctrine of sovereign immunity precluded a cause of action ex delicto (fraudulent misrepresentation). The second being a well established principle of contract law, finding clarity of expression in *United States v. Spearin,* 248 U.S. 132, 136, 39 S.Ct. 59, 61, 63 L.Ed. 166 (1918), that when one agrees to do a thing possible of performance "he will not be excused or become entitled to additional compensation because unforeseen difficulties are encountered."

█ Courts subscribing to the theory of a cause of action ex contractu in the nature of a breach of warranty apparently were motivated by concepts of fundamental fairness. To avoid an unjust result, they refused to be circumscribed by the harshness of the doctrine of sovereign immunity and the principle of contract law that if performance is possible one is not entitled to extra compensation for unforeseen difficulties encountered. Syllogistically, where a governmental entity makes a *positive* representation of a material fact relied upon by a contractor in calculating its bid, which turns out to be false or incorrect after work is commenced and occasions additional expense, the contractor finds himself in the position of one who undertakes one contract but is confronted with performance of another. The governmental entity, pragmatically speaking, gets the benefit of another contract. If performance thereof by the contractor entails more expense than was calculated in submitting its bid, the governmental entity should bear the added cost rather than the contractor because the former is the beneficiary of necessary but unbargained for work resulting from its positive representation of a material fact which turned out to be false or incorrect.

In the factual and legal context heretofore set forth, it is now appropriate to address the points relied on by the Commission on appeal, to-wit: (1) the trial court erred in denying Commission's motion for judgment notwithstanding the verdict; (2) the trial court erred in giving Ideker's requested verdict director; (3) the trial court

erred in refusing Commission's requested instruction submitting the affirmative defense of payment; (4) and (5) the trial court erred in overruling Commission's objections to certain evidence offered by Ideker; and (6) the Commission was deprived of a fair trial due to the cumulative effect of the various errors raised on appeal.

The Commission's first point, error on the part of the trial court in denying Commission's motion for judgment notwithstanding the verdict,[2] rests on two separate grounds: (1) The plans prepared by the Commission, literally speaking, contained no language to the effect that the project was a "balanced" job; (2) Section 203.1.6.2, Standard Specifications, and certain provisions of the bid proposal, the formal contract, and other Standard Specifications (all hereinafter set forth in greater detail) negated any right on the part of Ideker to rely on the Commission's positive representation, if in fact made, that the project was a "balanced job".

■ The Commission's position that the plans which it prepared did not positively represent the project as a "balanced job", because not verbally stated as such therein, is untenable. Essentially the same argument was advanced by the Commission and rejected in *Bernard McMenamy, Etc. v. Missouri State Highway Commission,* supra, 582 S.W.2d at 311: "This case does not deal with words, for which resort to a dictionary may ordinarily assist in interpreting the terms of an agreement. It deals with lines on plans, lines the significance of which would be apparent only to engineers, contractors or others familiar with highway construction plans."

The undisputed evidence in the instant case pointed in one direction—the plans in question positively represented the project to be a "balanced job" with like efficacy as if literally spelled out word for word. In sum, *McMenamy* teaches that the use of conventional syntax is not the only means of making a positive representation.

The Commission further argues that Section 203.1.6.2, Standard Specifications, providing that "[t]he use of borrow or waste areas other than those shown on the plans or designated by the resident engineer may be approved" was the antithesis of a positive representation that the project was a "balanced job." A careful perusal of the plans fails to disclose any designated "waste areas." Moreover, the "boiler plate" specification which the Commission relies on, reasonably construed in light of all the facts, relates, at best, to the disposal of minimal waste within reasonable tolerances that might be encountered rather than rebutting or nullifying a positive representation that the project was a "balanced job". By way of reiteration, Ideker encountered a massive amount of waste on the project as opposed to a minimal amount that could be categorized as being within reasonable tolerances for the type of project reflected by the plans.

The Commission also stresses a number of other provisions gleaned from the bid proposal, formal contract and other Standard Specifications as abrogating Ideker's claim that the plans positively represented the project as a "balanced job". First, the Commission refers to a provision in the bid proposal that given "quantities" were not guaranteed by the Commission and to a provision in the Standard Specifications that "quantities" in the bid schedule were only approximate. Common sense dictates, that the "quantities" abstractly referred to related to the amount of material to be excavated from the "cuts" and placed in the "fills" and were not indicative that the project was other than a "balanced job". At the risk of being redundant, the term "quantities" as used in the documents relied on by the Commission doubtlessly referred to the amount of material to be moved from "cuts" to "fills" rather than limitations on the character of the project as a "balanced job". Reference to "quantities" as "approximate only" in contract documents in-

---

**2.** Commission, both at the close of Ideker's evidence and at the close of all the evidence, filed motions for a directed verdict.

volved in *Hollerbach v. United States,* supra, 34 S.Ct. at 555, was construed as "estimates" of the amount of work specified in the contract and rejected as having any bearing on site conditions positively represented by the plans.

The Commission also relies on three other "boiler plate" provisions found, respectively, in the formal contract, and the bid proposal and Standard Specifications incorporated therein. The formal contract contained a provision which, fairly paraphrased, provided, insofar as here pertinent, that the contractor was fully informed regarding all conditions affecting the work to be done by reason of its own investigation and not from any estimates of the Commission. The bid proposal recited inter alia, that the contractor, as a bidder, "declares ... that he has carefully examined the location of the proposed work ...". Section 102.5, Standard Specifications, provided, in part, that "submission of a bid shall be considered proof that the bidder has made his own examination and is satisfied as to the conditions to be encountered in performing the work". The Commission's present reliance on the three provisions last mentioned is somewhat anomalous as it advanced the same "boiler plate" provisions to no avail in *Bernard McMenamy, Etc. v. Missouri State Highway Commission,* supra. There, the court held that a positive representation of a material fact by the Commission was not "negatived" by such provisions. Although not stated in so many words, the court obviously concluded that although such provisions might controvert reliance on "implied" or "suggestive" representations, they could not stand in disavowal of a positive representation of a material fact. This accords with *Hollerbach v. United States,* supra, where a general provision requiring an on site inspection by a contractor was rejected as defeating reliance by a contractor on a positive representation of a material fact made by a governmental entity.

Commission's first point on appeal affords no basis for relief as a seriatim analysis of each supportive argument discloses that the trial court properly denied Commission's motion for judgment notwithstanding the verdict.

Commission's second point, error in giving Ideker's requested verdict director, disappears in the fatal abyss of not having been properly preserved for appellate review. Try as one may, it is impossible to ascertain any degree of specificity in Commission's objections to Ideker's verdict director until the argument portion of its brief is reached. There, for the first time, Commission argues (1) that Ideker's verdict director did not adequately submit that the plans contained a "positive" representation that the project was a "balanced" job, and (2) did not require the jury to find that the Commission knew the project was not a "balanced" job.

Rule 70.03, insofar as here pertinent, provides that "[s]pecific objections to instructions shall be required in motions for new trial unless made at trial." Ideker's verdict director was not specifically objected to at trial, nor do the following objections made by the Commission in its motion for new trial meet the test of specificity laid down in Rule 70.03: "The trial court erred by reading the jury instruction Four (4) tendered by plaintiff because said instruction was not the correct verdict directing instruction on affirmative representation by defendant"; and "The trial court erred by reading the jury instruction Four (4) tendered by plaintiff because said instruction did not accurately state the nature of the alleged breach of contract." The objections set forth in Commission's motion for new trial were nothing more than raw, abstract charges that Ideker's verdict director did not correctly declare or state the law. They neither met the test of specificity nor preserved anything for appellate review. *Associated Underwriters v. Mercantile Trust Co.,* 576 S.W.2d 343, 346 (Mo.App.1978); and *Larson v. Alton and Southern Railroad Company,* 431 S.W.2d 687, 691–92 (Mo.App.1968). The failure to get down to specifics when objecting to instructions, either at trial or in motions for new trial, deprives trial courts of the oppor-

tunity to correct their own errors and will not be countenanced on appeal. *Bower v. Hog Builders, Inc.,* 461 S.W.2d 784, 797–98 (Mo.1970).

■■■ This court observes, ex gratia, that the rule approved in pre-MAI cases that it was not reversible error to omit an undisputed fact from a verdict director, applies as well in cases submitted under MAI. *Cline v. Carthage Crushed Limestone Company,* 504 S.W.2d 102, 111–12 (Mo.1973). Although Ideker's "not in MAI" verdict director cannot be heralded as a model, all the evidence, both that of Ideker and the Commission, inexorably bore out an undisputed fact, i.e., the plans on which Ideker based its bid were "intended" and "designed" by the Commission and perceived and understood by Ideker as positively representing the project to be a "balanced job".[3]

■ This court also observes, ex gratia, that Ideker's verdict director was not legally infirm because it failed to require a finding by the jury that the Commission knew the representation relied upon by Ideker was false or incorrect. The majority of the precursory cases fashioning the cause of action relied upon by Ideker do not mention scienter on the part of the governmental entity that the positive representation was false or incorrect as an element of such a cause of action. Concededly, although a

few of the earlier cited cases perfunctorily refer to evidence of scienter on the part of a governmental entity, they refrain from declaring it to be a necessary element of such a cause of action. Having determined that Ideker's cause of action is ex contractu in the nature of a breach of warranty, it is deemed appropriate to turn to general principles of law applicable to warranties to resolve the question of whether scienter on the part of the Commission was a necessary element of Ideker's cause of action. The governing principle is clearly explicated in 77 C.J.S. Sales, § 304, p. 1120: "The elements of scienter and intent which ... are essential to constitute fraud, need not be present in the case of warranty." See also *Chappell v. Boram,* 159 Mo.App. 442, 141 S.W. 19 (1911). This court concludes that scienter on the part of the Commission that its positive representation that the project was a "balanced job" was false or incorrect was not a requisite element of Ideker's cause of action.

■ The Commission also posits error on the trial court's refusal to give its requested instruction submitting the "affirmative defense of payment". This alleged instructional error was specifically raised in Commission's motion for new trial and, having been properly preserved, merits appellate review. The Commission rationalizes that

---

**3.** Without exception, cases cited in the body of the opinion developing and espousing the theory of recovery relied on by Ideker speak of actionable representations in terms of "positive" or "affirmative" representations. Collectively, they leave no escape from the conclusion that a *bright* line is drawn between "positive" or "affirmative" representations and representations of a lesser degree which are merely implied or suggestive. A "positive" or "affirmative" representation distinguishes an actionable representation from one which is merely implied or suggestive. Ergo, a "positive" representation of a material fact is a necessary element of such a cause of action. The tightly drawn distinction between "positive representations" and "representations" is more than an exercise in semantics or the exaltation of form over substance. The requirement that the representation be "positive" or "affirmative" goes to the very heart of whether a submissible case is made by reason of "boiler plate" provisions invariably found in this and

similar cases ostensibly disclaiming a contractor's reliance on the representation. A distinction implicitly weaves throughout representative cases from other jurisdictions that a contractor's reliance on representations, neither positive nor affirmative, but implied or suggestive only, may be disclaimed by comparable "boiler plate" provisions. This distinction was clearly drawn in two Missouri cases. In *Sandy Hites Co. v. State Highway Commission,* 347 Mo. 954, 149 S.W.2d 828 (1941), it was held that a representation which did not rise to the level of a positive or affirmative representation was disclaimed by comparable "boiler plate" provisions. Conversely, in *Bernard McMenamy, Etc. v. Missouri State Highway Commission,* supra, 582 S.W.2d at 313, it was held that a contractor's reliance upon a "positive" representation of a material fact made by the Missouri State Highway Commission *was not* disclaimed by "boiler plate" provisions identical to those in the instant case.

since Ideker was paid the contract price for work performed on the project, such constituted an absolute defense to the present action. Although this purported defense does not appear to have arisen in any previously cited Missouri cases involving Ideker's theory of recovery, it has been raised to no avail in other jurisdictions. When confronted in *Hersey Gravel Co. v. State,* 305 Mich. 333, 9 N.W.2d 567, 571 (1943), it was held that payment of the contract price by the State and acceptance by the contractor did not constitute a waiver or bar further recovery in an action ex contractu in the nature of breach of warranty. See also *Pitt Const. Co. v. City of Alliance, Ohio,* 12 F.2d 28 (6th Cir.1926) and *Faber v. City of New York,* 222 N.Y. 255, 118 N.E. 609 (1918). The undergirding principle of these cases is adopted and the Commission's claim that the trial court erred in not submitting its requested instruction on the "affirmative defense of payment" is rejected.

Attention now focuses on the evidentiary points, two in number, raised by the Commission. Paraphrased, Commission's first evidentiary point charges the trial court erred in permitting Ideker's expert witness to testify as to the amount of extra costs incurred by Ideker in disposing of the waste because "no proper foundation was laid." Commission's second evidentiary point, also paraphrased, charges the trial court erred in "refusing to strike" the expert witness' testimony analyzing extra "dozer" costs over a three year period because such testimony "was based upon arbitrary figures".

■ The qualifications of Ideker's expert witness were never doubted or put in issue. Moreover, the overall substantiality and probative force of the evidence he relied upon for his opinion was never questioned or challenged. Thus, it is necessary to look to the argument portion of Commission's brief to place in perspective its claim that a proper foundation was not laid for the testimony given by Ideker's expert witness. Doing so demonstrates that the Commission takes the position that the expert witness improperly relied upon eight isolated bits of evidence which were of questiona-

ble admissibility. A pragmatic discussion of each follows, bearing in mind at all times that admission or exclusion of expert opinion testimony is a matter within the discretion of the trial court. *Butcher v. Main,* 426 S.W.2d 356, 359 (Mo.1968).

■ Use of an improper basis for estimating the amount of waste and locations where it was dispersed appears first. This alleged deficiency is cured by the fact that Ideker's expert witness testified that his basis was derived from walking the job, personal observation, and information derived from Ideker's construction superintendent who was responsible for the job. This testimony went in not once, but several times without objection. Any Commission objection predicated on the ground just mentioned goes to the weight of the expert witness' testimony rather than to its admissibility. See generally *Union Electric Co. of Mo. v. Simpson,* 371 S.W.2d 673, 678 (Mo.App.1963); and *Haley v. Edwards,* 276 S.W.2d 153, 161 (Mo.1955). It is also worthy of mention that Ideker's expert witness used 299,400 cubic yards of waste as a basis while the Commission's own witnesses estimated 355,937 cubic yards of waste. The Commission is hardly in a position to complain, as the amount of waste used as a basis for determining extra costs incurred by Ideker was more favorable to the Commission than its own estimates.

The Commission also claims that use of "computer simulative haul cycles" by the expert witness for calculating the cost of waste hauls was improper. Again, this objection goes to the weight rather than the admissibility of the expert witness' testimony. The evidence revealed that the calculated cost was based upon a computerized simulation program, developed by the expert witness in conjunction with Caterpillar Tractor Company, for time of haul for different types of equipment. In this respect, the expert's testimony was based upon more than mere speculation or conjecture— it had substantive support, the weight of which was for the jury.

The Commission claims there was no foundational support for the "rolling resist-

ance" or "friction coefficient", i.e., the measure of ground softness, used by the expert in calculating extra costs incurred in disposing of the waste. This claim will not be entertained on appeal because no objection posited thereon was made during the trial. *Federal Deposit Insurance Corp. v. Crismon,* 513 S.W.2d 305, 307 (Mo.1974); and *Niederkorn v. Niederkorn,* 616 S.W.2d 529, 535 (Mo.App.1981).

■ The Commission next contends that no foundation was laid for an equipment efficiency use rate of 40 minutes per hour relied on by the expert witness in making his calculations. This contention is clearly refuted by the record as the witness testified that a combination of "hauling dirt off grade", which reduced the equipment use rate per hour, and, an additional correction factor for inability to theoretically obtain 100% use performance, accounted for the equipment efficiency use rate of 40 minutes per hour.

■ By way of further attacking admission of the expert witness' testimony, Commission asserts that the basis employed by the expert witness in calculating extra costs incurred by Ideker resulted in a "double recovery". The course of the Commission's argument being that Ideker was paid twice for all Class A dirt removed from the fills, once at the contract rate of 40½ cents per cubic yard, and a second time on the basis of extra costs incurred in disposing of the waste. This contention is refuted by Exhibit 5, captioned "Unplanned Waste Cost Estimate", which was prepared by Ideker's expert witness and offered and admitted into evidence without objection. Said exhibit, inter alia, recites by way of explanation that "the time is totaled for the waste hauls and for the as-bid hauls, and the difference is the additional spread hours required because of the unplanned waste hauls in each balance."

■ The Commission charges use of an improper foundational basis because the expert witness computed equipment rental costs on 1974 "Blue Book" rates which did not reflect a difference in rates for 1972 and 1973 when the majority of the waste was encountered. This contention is also dispelled by Exhibit 5. The referred to exhibit explicitly recites and demonstrates that the 1974 "Blue Book" rates were "deflated 5% per year through 1971 in order to obtain the yearly rates."

Section 205.1, Standard Specifications, is injected by the Commission and accompanied by the argument that under the contract, Ideker was not entitled to additional compensation for hauling excavated material for distances less than 2000 feet. This was neither broached during trial as a foundational infirmity to the testimony of the expert witness, nor, at any time, below or on appeal, raised as a separate point. It is subject to being summarily disposed of on the grounds that it was never properly raised or preserved as a point of error. Moreover, it is patently obvious that the Standard Specification heretofore mentioned refers to hauling contemplated under the contract and is wholly inapplicable to extra costs incurred in disposing of the voluminous amount of unanticipated waste encountered.

■ Commission's final contention regarding their first evidentiary point is a "grape-shot" attack—if the amount of waste estimated by Ideker's expert for purpose of his computations was off, then, ipso facto, his cost calculations were erroneous. This argument attempts to beguile the facts. Ideker's expert witness estimated the waste at 299,400 cubic yards, an amount considerably less than the 355,937 cubic yards of waste estimated by the Commission. This alone denudes the present contention of any viability.

■ The Commission's second and final evidentiary point charges the trial court erred in refusing to strike the testimony of Ideker's expert witness pertaining to an analysis of extra "dozer" costs over a three year period because it was "arbitrarily" based upon the use of one extra "dozer". This contention borders on the incredible as the evidence disclosed that two or three extra "dozers" were required to handle the waste. The expert witness, however, for

some unexplained reason, testified that he "arbitrarily" computed extra "dozer" costs on the basis of one extra "dozer". The "arbitrary" decision made by the expert witness, in light of all the evidence, rebounded in favor of the Commission, and conversely, rebounded against Ideker. No claim of error can realistically be posited by the Commission on this favorable turn of events.

The subtle implication of Commission's combined evidentiary points is appropriately answered in *Denton Const. Co. v. Missouri State Highway Commission*, 454 S.W.2d 44, 56 (Mo.1970), where, as here, the Commission advanced no method by which damages could be more accurately measured than the method employed by an expert witness who appeared on behalf of plaintiff-contractor: "What is involved is a measurement of the damages sustained by plaintiff. The rule is set forth in *City of Kennett v. Katz Const. Co.*, 273 Mo. 279, 202 S.W. 558, 559, 562, as follows: '... let it be said ..., in applying the rule against the recovery of uncertain damages, it is the uncertainty as to their nature, and not as to their measure or extent, that is meant. While the actual amount of damages from the breach of a contract may not be susceptible of exact proof, the law does not permit one whose act has resulted in loss to another to escape liability on this account. The manner of measuring the damages having been ascertained, impossibilities in proving same are not required, but only that the best evidence be adduced of which the nature of the case is capable; in other words, the degree of certainty of the proof is dependent upon the character of the proceeding.'" See also *Coach House of Ward Parkway v. Ward Parkway Shops*, 471 S.W.2d 464, 471–72 (Mo.1971).

The Commission's final point, that the cumulative effect of all previously alleged errors prevented it from having a fair trial, is self answered by negative findings with respect to each of the individual assignments of error forming the whole.

Judgment affirmed.

All concur.