Fred O. UHLE, As Assignee of Apple
Electric Co., Plaintiff/Respon-
dent/Cross–Appellant,

v.

TARLTON CORP., and The American Insurance Company, Defendants/Appellants/Cross–Respondents,

v.

BOARD OF EDUCATION OF THE CITY
OF ST. LOUIS, Cross–Appellant.

Nos. 69673, 69674, 69695.

Missouri Court of Appeals,
Eastern District,
Division Three.

Jan. 7, 1997.

Rehearing Denied Feb. 19, 1997.

Richard F. Huck, III, St. Louis, for Tarlton.

Kenneth C. Broston, Carolyn M. Kopsky, St. Louis, for Bd. of Educ.

Dubail Judge, William Sitzer, St. Louis, for respondent.

GRIMM, Judge.

In this commercial litigation involving renovation of a building, the jury awarded plaintiff/subcontractor $100,000 on its quantum meruit claim against defendant/general contractor. It also awarded defendant a similar judgment on its breach of contract claim against third party defendant/owner of the building.

All parties appeal. Plaintiff alleges the trial court erred in granting defendant's summary judgment motion. It contends it should have been permitted to pursue its breach of contract claim.

Defendant and third party defendant appeal the judgments entered on the jury verdicts. They contend that the trial court erred in overruling their motions for directed verdict.

We affirm the granting of the summary judgment. We reverse the judgments entered on the jury verdicts.

### I. Background

In the summer of 1988, third party defendant Board of Education, owner of Cleveland NJROTC High School, and defendant Tarlton Corporation,[1] a general contractor, entered into a contract for the school's renovation. At that time, defendant entered into a subcontract with plaintiff Apple Electric Company[2] to furnish the electrical work required by the contract. The Board did not have a contract with plaintiff.

Under the contract, the building renovation was to be substantially completed by May 5, 1989. Final completion was due June 2, 1989.

The subcontract between plaintiff and defendant utilized a "Standard Subcontract Agreement" developed by the Associated General Contractors of America and other associations. In the agreement, plaintiff agreed to provide all labor and materials for "the ELECTRICAL WORK necessary for the renovation" of the school "in accordance with the drawings and specifications" prepared by the architect. Further, concerning change orders, the agreement stated that plaintiff would:

Make any and all changes or deviations from the original plans and specifications without nullifying the original contract when specifically ordered to do so in writ-

1. Plaintiff also sued The American Insurance Company, surety on Tarlton's Contract Labor and Material Payment Bond. Unless otherwise indicated, we refer to Tarlton and American singularly and collectively as defendant.

2. Fred O. Uhle was an owner of Apple Electric Co. when Apple entered into the contract with Tarlton. In late 1989, Apple assigned its rights and claims to Uhle. Unless otherwise indicated, we refer to Uhle and Apple singularly and collectively as plaintiff.

ing by [defendant]. [Plaintiff] prior to the commencement of this revised work, shall submit promptly to [defendant] written copies of the cost or credit proposed for such revised work in a manner consistent with the Contract Documents.

The renovation project did not go smoothly. There were problems from the beginning. During the course of the project, defendant and plaintiff modified the subcontract by executing twenty-three change orders. Plaintiff's project manager signed change orders one through eleven. The other change orders were signed by a vice president of the company.

All of the change orders were on a preprinted form. Each was dated and identified the project. The preprinted form then read, "You are directed to make the following change to this P.O./Subcontract:." At this point, typed language appeared. For example, change order number 7 read "For furnishing the necessary labor, material, tools and equipment for reinstallation of electric cords removed from stage lighting as per your verbal quote of 10–5–88, for the increased lump sum amount of THREE HUNDRED SEVENTY FIVE DOLLARS ($375.00)."

The preprinted form then continued, reading "All other terms and conditions of the subject P.O./Subcontract referred to above shall remain unchanged and in full effect." Following this were entries showing the original subcontract price, the net change from previous change orders, the total subcontract sum prior to this change order, the amount changed by this change order, and the new subcontract sum including this change order. The change orders were signed by representatives of plaintiff and defendant.

Defendant prepared all of the change orders. All entries on the forms were either preprinted or typewritten, except for signatures. On two of the orders, handwritten entries were made.

Defendant issued the first of the two, change order 8, on May 19, 1989. Plaintiff's project manager accepted it on July 19. On the change order, the project manager wrote,

"*Revised schedule dates* are per our letter of June 20, 1989." (emphasis added).

A June 20 letter proposed completion dates for various areas of the project, with the latest date being July 28. In addition, the letter indicated "increased costs associated with these dates" totalling $39,621.21. This letter was signed by plaintiff's project manager.

On June 26, plaintiff's vice president wrote defendant. His letter asked defendant to disregard project manager's June 20 letter. Also, the vice president sent plaintiff another letter dated June 20. This letter was similar to the project manager's letter, except it did not include any request for additional costs.

At trial, project manager testified that he had "secondhand" information that his June 20 letter had been withdrawn due to defendant's "contractual coercion." He said the coercion was defendant's objection to receiving a "claim letter on their project." He said he heard that defendant's representative told plaintiff's vice president that a progress payment would not be made unless he withdrew the claim letter.

The second order with a handwritten entry, change order 11, issued by defendant on July 12 and accepted by plaintiff on July 21, was a "no cost" change order. The typed portion of the order provides:

This is a no cost change order extending the contract time on the Renovation Work portion of the contract by sixty three (63) calendar days. This time extension is a result of the changes in the contract work to date.

Completion for the renovation work is changed from May 5, 1989 to July 7, 1989. The above is in accordance with the Owner's Change Order No. 20.

Plaintiff's project manager struck through the words, "from May 5, 1989 to July 7, 1989." He added, "*Schedule dates* are changed in accordance with Apple Electric's letter dated June 20, 1989." (emphasis added).

Plaintiff completed its work by the end of September, 1989. The original subcontract amount was $572,500. The change orders increased this to $873,503.45. The Board

paid that amount to defendant, who in turn paid it to plaintiff.

Plaintiff sued defendant, alleging two causes of action: breach of contract and quantum meruit. Plaintiff alleged that defendant either breached or abandoned the subcontract due to cardinal changes, delays, and fundamental alterations of the contract beyond its original scope.

In its breach of contract count, plaintiff sought reimbursement for productivity loss and inefficiency, additional direct costs, extended overhead costs, cost of capital, ten percent profit, and cost of claims preparation. It alleged these costs totaled $480,-144.80. In its quantum meruit count, it sought judgment for $480,150.80.

Prior to trial, plaintiff admitted that the subcontract, modified by the change orders, encompassed the entire scope of plaintiff's work on the renovation project. At trial, plaintiff's testimony acknowledged that the change orders encompassed the "direct costs of the work." However, its testimony was that the change orders did not cover indirect costs. The indirect costs included inefficiencies associated with larger crews, delays, and loss of productivity.

## II. Defendant's Appeal

### Extra Work Within Scope of Contract

Although defendant raises four points on appeal, its first point is decisive. In it, defendant alleges the trial court erred in not granting its motion for a directed verdict and motion for judgment notwithstanding the verdict. It contends plaintiff failed to make a submissible case because "the work forming the basis of [plaintiff's] claim was within the scope of the [plaintiff/ defendant] subcontract and was not 'extra work.' "

■ A directed verdict in favor of defendant is proper only if reasonable minds could not differ as to the proper verdict when the evidence is viewed in a light most favorable to plaintiff. *See Martin v. Pashia,* 892 S.W.2d 681, 683 (Mo.App. E.D.1994). A case

is not to be submitted unless each and every fact essential to liability is predicated upon legal and substantial evidence. *Id.* Whether there is sufficient evidence to submit an issue to the jury is a legal question in which the judge has no discretion. *Id.*

■ The dispute between the parties revolves around whether plaintiff did "extra work" as that term is used in connection with construction contracts. "Extra work" means "work of a nature [1] not contemplated by the parties and [2] not controlled by the contract." *American Drilling Serv. Co. v. City of Springfield,* 614 S.W.2d 266, 274 (Mo. App. S.D.1981) (brackets and numbers added); *Steinberg v. Fleischer,* 706 S.W.2d 901, 906 (Mo.App. E.D.1986); *Air Cooling & Energy, Inc. v. Midwestern Constr. Co.,* 602 S.W.2d 926, 930 (Mo.App. W.D.1980).

■ In the case before us, the work was not "extra work" because the work was "controlled by the contract." In each situation involving a change to the original contract, plaintiff and defendant executed a change order. The change order, pursuant to the underlying contract, authorized a change in the work, an adjustment of the contract sum, an adjustment of the contract time, or a combination thereof.

Each signed change order stated whether the subcontract sum would be increased or decreased by the change order. Moreover, each stated what the new "subcontract sum including this Change Order will be." The last change order indicates that the new subcontract sum is $873,503.45, the amount defendant paid plaintiff.

Nevertheless, plaintiff maintains that "the change orders were signed to cover the direct costs of doing the extra work and that they did not cover the indirect costs and impact costs of doing the work." Thus, it contends, the work causing the indirect and impact costs constitutes "extra work" outside of the contract.

None of the Missouri cases cited by the parties concerning "extra work" advance plaintiff's position.[3] However, we briefly

3. The parties also refer to several federal decisions. Under some of them, plaintiff's claim arguably could be cognizable. However, that is

because a federal regulation requires fixed price contracts to contain a specific clause. That clause authorizes "an equitable adjustment for

mention them to illustrate factual situations where appellate courts have approved or rejected that concept.

In *Haughton Elevator Co. v. C. Rallo Contracting Co.*, 395 S.W.2d 238 (Mo.App. E.D. 1965), plaintiff and defendant contracted for the installation of an elevator. The contract provided that if, in digging the "jack hole," rock was encountered, the contract price would be increased by cost plus 10% and 10%. *Id.* at 242.

Rock was encountered and plaintiff proceeded to drill without complying with other contract provisions concerning "extras." This court did not deem the "drilling through rock [as] extra work. Extra work, as used in connection with building contracts, means work of a nature not contemplated by the parties and not controlled by the contract. 'Extra' work is work entirely independent of the contract, something not required in its performance." *Id.* at 245. (citations omitted).

In *Kaiser v. Lyon Metal Products, Inc.*, 461 S.W.2d 893 (Mo.App. W.D.1970), a sub-subcontractor sued a subcontractor for "extra work" done by him in the completion of a contract. Under the contract, the sub-subcontractor was to assemble and install lockers, cabinets, and similar items.

The sub-subcontractor sued in quantum meruit for "extra work." The "extra work" was for labor necessary to correct imperfections in the building. It included removing angles and excess concrete so the lockers could sit flush, excessive shimming (up to 11/4"), and thirteen other related items. *Id.* at 895–96. The *Kaiser* court held that it could not say, as a matter of law, that the services did not constitute "extra work." *Id.* at 899.

In *Air Cooling*, a contract called for a subcontractor to remove subsurface soil and material for the purpose of installing pipes. When the subcontractor struck rock, it asked for a change order and extra payment, which was refused. *Air Cooling*, 602 S.W.2d at 928. It sued for "extra and unforeseen work."

The trial court denied subcontractor's claim, and the denial was affirmed. The *Air Cooling* court stated:

> it cannot be concluded that the removal of the rock was *extra and unforeseen work* not within the contemplation of the parties. It is unfortunate that the cost of rock removal was not calculated within appellant's original bid, but it could have taken necessary precautions to have included such cost. (emphasis original).

*Id.* at 930.

In *Ideker, Inc. v. Missouri State Highway Comm'n*, 654 S.W.2d 617 (Mo.App. W.D. 1983), the plaintiff sued for extra costs incurred in disposing of surplus rock and soil in a highway construction project. *Id.* at 620. In its attempt to defeat the claim, the defendant argued that the contract said the plaintiff was "fully informed regarding all conditions," it had "carefully examined the location," and the submission of the bid was "proof" that it had made its own examination and was satisfied with the conditions. *Id.* at 623.

The *Ideker* court rejected defendant's contract arguments, calling them "boilerplate." *Id.* Instead, it found that the defendant's contract plans and specifications contained a "positive representation" that there would be only minimal surplus rock, rather than the "massive amount" encountered. *Id.* at 622. This positive representation was in fact a misrepresentation and justified payment for the extra work. *Id.* at 623. *See also Sanders Co. Plumbing v. City of Independence*, 694 S.W.2d 841 (Mo.App. W.D.1985).

In *Steinberg v. Fleischer*, the contractor counterclaimed against the landowner for breach of contract and quantum meruit. *Steinberg*, 706 S.W.2d at 903. This court adopted the definition of "extra work" as set forth in *American Drilling*, and approved the submission of the quantum meruit count. *Id.* at 906. We observed there was ample evidence that contractor incurred additional

changes that cause an increase or decrease in the cost of or the time required for work under the contract, 'whether or not changed by any such order.'" *Commercial Contractors, Inc. v. United States*, 25 Cl.Ct. 666, 669 (U.S.Claims Court 1992); *CYR Constr. Co. v. United States*, 27 Fed. Cl. 153 (U.S. Court of Federal Claims 1992).

expenses as a result of landowner's misrepresentation of soil conditions. *Id.* at 907.

In contrast to these cases, plaintiff here agreed to and signed all twenty-three of the change orders to the original contract. Each change order clearly indicated the adjustment, if any, as a result of the change.

Plaintiff modified only two of the change orders, numbers 8 and 11. Those two modifications pertained to "Revised schedule dates" and "Schedule dates." Specifically, they did not indicate that any additional cost would be claimed except as stated on the change orders. Defendant paid and plaintiff received the amount shown on the last change order as the new subcontract sum, i.e. the total amount of the contract.

Certainly, change orders, as well as "extra work," may delay a project and increase its costs. As noted in Missouri Construction Law, § 12.20 (MoBar 1994), either could "disrupt the planned sequence, extend the project to a low-efficiency cold weather period, or otherwise disrupt planned productivity." As suggested in *Air Cooling*, plaintiff "could have taken necessary precautions" to protect itself. *Air Cooling*, 602 S.W.2d at 930.

To avoid such an unfavorable occurrence, a contract could provide that in the event of such situations, the contractor reserves its right to claim impact costs until the full impact of the changed or "extra work" is appreciated. *Missouri Construction Law*, § 12.20. Or, the contract could contain a clause patterned after the federal regulation referred to in footnote 3 to allow consideration of such costs.

Here, no such actions were taken. The work was "controlled by the contract." *American Drilling*, 614 S.W.2d at 274. Under Missouri case law, such work does not constitute "extra work" and plaintiff cannot recover for it under quantum meruit. Defendant's point is granted.

### III. Plaintiff's Appeal of Summary Judgment

Plaintiff raises one point as cross-appellant. It contends the trial court erred in granting defendant's motion for summary judgment on the breach of contract action.

It argues there was a genuine issue of material fact as to whether defendant "orally agreed to negotiate the impact costs associated with the charged work separate and apart from the direct costs set forth in the executed change orders."

A summary judgment shall be entered if the motion and response both show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Rule 74.04; *ITT Commercial Finance v. Mid–Am. Marine*, 854 S.W.2d 371, 376 (Mo.banc 1993). Propriety of summary judgment is purely an issue of law. *Id.* at 376. Therefore, the standard of review on appeal is no different from that which should be employed by the trial court to determine whether it is proper to sustain the motion initially. *Id.*

Plaintiff argues that it submitted the affidavit of its project manager stating defendant orally agreed to negotiate costs separate from the costs in the change order. In addition, he identified letters he wrote stating plaintiff's intent to make a claim for costs and schedule impacts. Therefore, plaintiff contends, there was a material issue of fact for the jury to decide. We disagree.

The letters the project manager identified were ones he wrote between October 18, 1988 and June 20, 1989. His June 20 letter concerned "proposed completion dates" and "increased costs associated with these dates." The costs included $18,483.10 for "Non-working Foremen," $15,023.21 for "Crew–Size inefficiencies," $2,512.97 for "Miscellaneous & Tools," and $3,601.93 of "10% overhead and profit."

However, as noted earlier, on June 26, plaintiff's vice president wrote defendant and asked it to disregard project manager's letter. The vice president sent defendant a new June 20 letter, which did not include any request for additional costs. By this action, plaintiff effectively notified defendant that it was dropping its claim for additional costs.

Project manager's affidavit also referred to a letter plaintiff's president wrote to defendant on July 6, 1989. In that letter, he stated that several factors have "greatly impacted us and is resulting in a substantial out

of pocket loss." However, he continued by saying that plaintiff had "decided to 'bite the bullet' and make every possible effort to finish as requested." He asked defendant to "consider what can be done to help us recover from this financial disaster."

As can readily be seen, nothing in this letter indicates plaintiff claimed that defendant breached the contract. Nor does it show that plaintiff and defendant agreed defendant was going to compensate plaintiff for indirect impact costs.

Plaintiff's contract with defendant required plaintiff to make all claims for extras, extensions of time, and damages "for delays or otherwise" promptly. The contract also provided that change orders do not nullify the original contract and that plaintiff must furnish "written copies of the cost or credit proposed for such revised work."

The evidence before the trial court when it considered the summary judgment motion included two admissions from plaintiff. Plaintiff admitted that it did not expressly reserve a right to make a future claim for inefficiencies or productivity loss in any of the change orders. Further, it also admitted that all "labor, materials or services" it supplied for the project were "within the scope of [its] written subcontract with [defendant]." The evidence also disclosed that defendant paid plaintiff the full amount due as reflected on the last change order.

Plaintiff further argues that the fact issue to be determined is "not whether the change orders included *the work* required by the change in scope, but rather whether the change orders included *the costs* associated with the change of scope." However, under the contract, "written copies of the cost or credit proposed for such revised work" were required to be submitted.

At best, the changes plaintiff made to the change orders concerned only schedule dates, not costs. Thus, the record does not disclose any fact issue "concerning whether the change orders included *the costs* associated with the change of scope."

Summary judgment is particularly appropriate if the issue to be decided is the construction of a contract that is unambiguous on its face. *Daniels Exp. and Transfer*

*v. GMI Corp.*, 897 S.W.2d 90, 91–92 (Mo.App. E.D.1995). The test for ambiguity is whether the disputed language is reasonably susceptible to more than one meaning when the words are given their plain meaning as understood by an average person. *Id.* at 92. A contract is not ambiguous merely because the parties disagree over its meaning. *Id.* The language "schedule dates" is not ambiguous and does not refer to costs. Point denied.

### IV. Board's Appeal

The Board of Education cross-appealed, raising five points. In view of our disposition of defendant's appeal, we need not address them.

Defendant's third party petition against Board sought damages from the Board only if it was adjudged liable to plaintiff. Because we set aside plaintiff's judgment against defendant, we also set aside defendant's judgment against the Board. Thus, the Board's points are moot.

The trial court's judgment sustaining defendant's motion for summary judgment on Count I is affirmed. The trial court's judgment on Count II in favor of plaintiff and against defendant is reversed, as is defendant's judgment against the Board. Costs assessed to plaintiff.

CRAHAN, P.J., and HOFF, J., concur.