# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 98-3626

_____

| | | |
|---|---|---|
| R. M. Taylor, Inc., a Missouri corporation, | * * * | |
| Appellee, | * * | |
| v. | * * * | Appeal from the United States District Court for the Western District of Missouri. |
| General Motors Corporation, a Delaware corporation, | * * * | |
| Appellant. | * | |

_____

Submitted: April 21, 1999

Filed: August 13, 1999

_____

Before RICHARD S. ARNOLD and WOLLMAN,[1] Circuit Judges, and WOLLE,[2] District Judge.

_____

[1]Roger L. Wollman became Chief Judge of the United States Court of Appeals for the Eighth Circuit on April 24, 1999.

[2]The Honorable Charles R. Wolle, United States District Judge for the Southern District of Iowa, sitting by designation.

WOLLMAN, Chief Judge.

General Motors Corp. (GM) appeals from the denial of its motion for judgment as a matter of law following a jury verdict in favor of R.M. Taylor, Inc. (RMT), which found that GM had impliedly abandoned construction contracts with RMT. We reverse and remand.

## I.

RMT entered into contracts to design and construct conveyor systems at several GM plants. Each contract contained the following provision:

> The Owner (GM) shall have the right at any time to require alterations in, additions to and deductions from the work shown on the Drawings or described in the Specification without rendering void the Contract. . . . All changes shall be described in an Emergency Field Order or Bulletin issued by the Owner. Receipt of Drawings or verbal orders shall not constitute authority to proceed with changes in the work. An Emergency Field Order authorizes the Contractor to proceed immediately with the work described therein with the price to be determined. A BULLETIN IS A REQUEST FOR QUOTATION. The Contractor shall not proceed with the work described in the bulletin until the work is authorized by [a]n Emergency Field Order, [a] Contract Supplement, or [a] Contract Change Order.

GM Construction General Conditions (GM 1638) § 46.1, Appellant's Appx. at 204. The contracts also contained detailed provisions on the pricing of emergency field order work. See id. §§ 46.2-46.4, Appellant's Appx. at 204-08. Because RMT placed the bids based on general drawings rather than customized designs for each plant, the provisions regarding changes in the work were particularly important.

To receive periodic payments under the contracts, RMT was required to inform GM of the status of its payments to subcontractors. See id. § 44.12, Appellant's Appx. at 203. This requirement was included because the subcontractors could file mechanic's liens against GM's property if they were not paid by RMT. The contracts allowed GM to withhold payments from RMT and make payments directly to the subcontractors in the event RMT did not submit lien waivers showing that the subcontractors had been paid. Id.

During the construction of the conveyor systems, GM ordered many changes from the general drawings originally submitted by RMT. These changes were implemented through bulletins and emergency field orders. The number of changes ordered and overall increased costs of the projects were as follows:

| Location | Original Price | Changes | Final Price | Increase |
|---|---|---|---|---|
| Arlington, TX | $5,100,000 | 15 | $5,949,173 | 16.7% |
| Bowling Green, KY | $14,265,815 | 42 | $16,935,183 | 18.7% |
| Doraville, GA | $11,754,000 | 64 | $24,308,493 | 106.8% |
| Pontiac East, MI | $4,500,000 | 44 | $5,540,506 | 23.1% |
| Shreveport, LA | $2,710,089 | 5 | $3,200,498 | 18.1% |
| Wentzville, MO | $7,787,845 | 3 | $9,600,000 | 23.3% |

See Trial Tr. at 541 (Wentzville final price), 1246-50 (Arlington original price, changes, and final price; Bowling Green original price, changes, and final price; Doraville original price, changes, and final price; Pontiac East original price, changes, and final price; Shreveport final price; Wentzville changes), 1578 (Shreveport original price), 2372 (Shreveport changes); Def. Ex. 958A (Wentzville original price).

Because bulletins were simply requests for quotations, RMT did not proceed with additional work described in bulletins unless it chose to submit a quotation and was awarded the additional work at that rate by GM. For emergency field orders, however, the contracts required RMT to perform the additional work immediately and

then negotiate with GM to obtain payment. The negotiation process required RMT to provide GM's local contract manager a quote for the emergency field order work. The contract manager would then submit the quote to GM's plant engineer and overall project engineer for approval. GM could accept the quote or reject it and propose a different amount for payment. If GM rejected the quote, the contract manager and RMT's project manager would meet to discuss the discrepancy and agree on a price, which would be submitted to GM's plant engineer and overall project engineer for approval. This initial quotation process usually lasted between four and ten days.

After the parties agreed on a quote, RMT would submit a formal invoice, a sworn statement detailing the amounts to be paid to subcontractors, and the lien waivers to GM's contract manager. This documentation would then be submitted to the GM engineers for approval. It would then be forwarded to GM's accounting department, whereupon the first official "receipt" of the invoice would be generated. The documentation would then be returned to the contract manager for submission to the local GM finance department, resulting in the issuance of a second receipt, which would be sent to the GM disbursement department for payment. This process usually lasted between two and four weeks from the time the parties agreed on a quote.

If the invoice was for more than $100,000, it would pass through the audit department. If that department approved the invoice, the contract would be formally amended and RMT would be paid. In such a case, the total processing time for the invoice was three to six weeks from the time RMT provided GM's local contract manager with a quote for the emergency field order work. If the audit department found a problem with the invoice or its supporting documentation, however, it would return the materials to RMT for resubmission. In such a case, the total processing time might extend to more than ten weeks. Once the invoice was formally approved and the contract amended, GM had until the 25th of the following month to pay RMT.

This negotiation process, as opposed to the bidding process used for bulletins, required RMT to cover the additional expenses resulting from emergency field orders. The longer GM negotiated the price of the field orders, the longer RMT was forced to cover these expenses. As a result of these delays in payment, RMT was unable to pay its subcontractors, and it ultimately brought suit against GM, alleging excessive changes in the contracts and excessive delays in payment.

Count I of RMT's complaint alleged that GM's actions constituted a breach of the contracts; Count II alleged that GM impliedly abandoned the contracts. Although the jury heard evidence on both counts, the district court severed Count I "for separate resolution" and submitted only Count II to the jury. The jury found implied abandonment and awarded RMT quantum meruit damages of $21.5 million. The court entered judgment on the verdict and denied GM's renewed motion for judgment as a matter of law.

## II.

We review the denial of a motion for judgment as a matter of law de novo. See Arthaud v. Mutual of Omaha Ins. Co., 170 F.3d 860, 862 (8th Cir. 1999). GM is entitled to judgment as a matter of law "only if there was insufficient evidence to support the jury verdict." Id. We view all facts and resolve all conflicts in favor of RMT in making this determination, giving it the benefit of all reasonable inferences. See Varner v. National Super Markets, Inc., 94 F.3d 1209, 1212 (8th Cir. 1996). If the evidence is such that no reasonable juror could have inferred an intent to abandon the contracts, however, GM is entitled to judgment as a matter of law and we must reverse. See id.

Because our jurisdiction is premised on diversity, we apply state substantive law to RMT's claim. See Zunamon v. Brown, 418 F.2d 883, 889 (8th Cir. 1969) (citing Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1938)). The district court correctly

concluded that Michigan law controls under the choice-of-law provision agreed to by the parties in the contracts.  See Moses v. Union Pac. R.R., 64 F.3d 413, 418 (8th Cir. 1995) (holding that district courts must apply the choice-of-law rules of forum states); Consolidated Fin. Inv., Inc. v. Manion, 948 S.W.2d 222, 224 (Mo. Ct. App. 1997) (stating that Missouri courts defer to parties' contractual choice-of-law provisions).

"The abandonment of a contract is a matter of intention to be ascertained from the facts and circumstances surrounding the transaction from which the abandonment is claimed to have resulted."  Dault v. Schulte, 187 N.W.2d 914, 915 (Mich. Ct. App. 1971) (quoting 17 Am. Jur. 2d Contracts § 484 (now 17A Am. Jur. 2d Contracts § 543 (1991))).  A party displays an intent to abandon if it "positively and absolutely refuses to perform the conditions of the contract, such as a failure to make payments due, accompanied by other circumstances, or where by [its] conduct [it] clearly shows an intention to abandon the contract."  Collins v. Collins, 83 N.W.2d 213, 216-17 (Mich. 1957) (internal quotations omitted).  Abandonment must be mutual, however; if one party continues to perform under the contract after the other party exhibits an intent to abandon, there has been no abandonment.  See 17A Am. Jur. 2d Contracts § 543; see also S. S. Silberblatt, Inc. v. Seaboard Sur. Co., 417 F.2d 1043, 1054-55 (8th Cir. 1969) (holding that abandonment requires mutual consent of the parties); Dault, 187 N.W.2d at 915-16 (finding that the parties abandoned the contract because one party ordered work not contemplated in the contract and the other party "acquiesced" by performing the non-contractual work rather than performing under the contract).

In support of the verdict, RMT argues that GM exhibited an intent to abandon the contracts by ordering too many changes, using emergency field orders when it should have used bulletins, and abusing the negotiation process to intentionally delay payment of field orders and leverage RMT into accepting less for its work.  We address each argument in turn.

## A.

RMT contends that an intent to abandon the contracts can be inferred from GM's excessive and untimely use of emergency field orders. According to RMT, it "was forced, by use of an economic hammer, to acquiesce to GM's abandonment, not only to its detriment but to its actual destruction." Appellee's Br. at 16. At trial, RMT's construction consultant Michael Callahan testified that change orders that raise project costs by more than ten percent are typically considered unreasonable in the construction industry. See Trial Tr. at 1253-56. In addition, Callahan stated that the timing of GM's field orders harmed RMT. See id. at 1257.

RMT failed, however, to demonstrate that GM's use of field orders evinced an intent to abandon the contracts. To the contrary, because the contracts included change-order clauses, GM acted in conformance with the terms of the contracts in issuing field orders. The Michigan cases cited by RMT that find implied abandonment are distinguishable because they did not involve contracts that included such clauses. See Dault, 187 N.W.2d at 915; H.O. Brackney & Son v. Ryniewicz, 78 N.W.2d 127, 130 (Mich. 1956); Fenner v. Bolema Constr. Co., 47 N.W.2d 662, 664 (Mich. 1951).

Nonetheless, RMT maintains that GM abused the change-order provisions by ordering changes outside the scope of the original contracts. RMT relies on cases from jurisdictions that have expanded the abandonment doctrine to cases involving contracts containing change-order clauses. See Peter Kiewit Sons' Co. v. Summit Constr. Co., 422 F.2d 242, 254-55 (8th Cir. 1969) (applying South Dakota law); C. Norman Peterson Co. v. Container Corp. of Am., 218 Cal. Rptr. 592, 598 (Cal. Ct. App. 1985); Bogert Constr. Co. v. Lakebrink, 404 S.W.2d 779, 782 (Mo. Ct. App. 1966); Schwartz v. Shelby Constr. Co., 338 S.W.2d 781, 788-91 (Mo. 1960). The abandonment doctrine has not been so expanded under Michigan law, and we will not expand an equitable state law doctrine such as implied abandonment beyond the clear dictates of state case law. See, e.g., Agrigenetics, Inc. v. Rose, 62 F.3d 268, 270-71 (8th Cir.

1995) (refusing to apply an equitable doctrine in a diversity case because the state courts had not recognized it); McIlheran v. Lincoln Nat'l Life Ins. Co., 31 F.3d 709, 711 (8th Cir. 1994) (same); cf. Adams Pub. Sch. Dist. v. Asbestos Corp., 7 F.3d 717, 719 (8th Cir. 1993) (applying an equitable doctrine even though the state courts had not recognized it because the federal interest was "sufficiently strong").

Even if it were held that excessive or untimely change orders could support a finding of implied abandonment under Michigan law, the evidence does not support such a finding in this case. The cases relied on by RMT involved far more egregious facts. In Schwartz, changes were ordered nearly every day, including major structural changes, and only once was a change order issued as required by the contract. See 338 S.W.2d at 788-89. In Bogert, there was no binding contract from the beginning because the parties left material plans and specifications open for negotiation. See 404 S.W.2d at 781. Furthermore, the owner made extensive and frequent changes to the plans without following contractual change-order procedures. See id. at 780-81. In C. Norman Peterson "hundreds of changes" were ordered without following contractual change-order procedures. See 218 Cal. Rptr. at 599.

Here, changes were contemplated from the beginning of the projects because RMT placed the bids based on general rather than customized drawings. Further, GM consistently followed the contractual procedure for ordering changes. Accordingly, the changes did not go beyond the scope of the contracts. See Uhle v. Tarlton Corp., 938 S.W.2d 594, 597-99 (Mo. Ct. App. 1997) (finding no implied abandonment as a matter of law because the contract contemplated changes and the parties followed contractual change-order procedures); Oliver L. Taetz, Inc. v. Groff, 253 S.W.2d 824, 828 (Mo. 1953) (same).

In addition, RMT did not acquiesce in any attempt to abandon because it believed the field order work was part of the contracts. Patrick Perry, RMT's vice president of sales and estimating, acknowledged that accepting bids based on general

drawings was "inherently risky" because changes were always required in order to customize the conveyor systems for each plant. See Trial Tr. at 1198-1200. Arthur Bond, RMT's vice president of system integration on the Shreveport project, testified that "typically, in the course of a project, there are extras." Id. at 2095. Bond also stated that RMT knew about the need for changes and specifically requested "any and all additional work that might be available." Id. at 2120. According to Bond, RMT placed attractive bids by using low profit margins and then recouped profits by doing extra field order work that allowed for higher margins. See id. at 2095-97; see also GM 1638 § 46.2, Appellant's Appx. at 204 (allowing overhead and profit in the payment of field orders). Unlike bulletins, which were competitively bid, RMT was guaranteed to receive the emergency field order work. Accordingly, RMT may have actually benefitted from GM's use of field orders.

**B.**

Nor was there sufficient evidence to support RMT's theory that GM exhibited an intent to abandon the contracts by using emergency field orders in non-emergency situations. An "emergency" is "an unforeseen combination of circumstances or the resulting state that calls for immediate action," "a pressing need," or "a usually distressing event or condition that can often be anticipated or prepared for but seldom exactly foreseen." Webster's Third New Int'l Dictionary (1986). RMT does not cite a different definition that is customary in the construction industry. Nor does the evidence suggest that this definition was not met when GM issued emergency field orders in this case. To the contrary, Mark Murray, RMT's vice president of sales and engineering on the Bowling Green project, testified that the forty-two change orders on that project was not an unusually high number, "[e]specially since we were the only conveyor contractor on the project." Trial Tr. at 2277-78.

## C.

RMT also claims that GM's delay in paying field orders constituted an implied abandonment. It introduced evidence that John Gilpin, GM's project director at Doraville, believed that there were excessive payment delays for field orders on that project. See id. at 399-406. GM argues that the district court erred by admitting the Doraville evidence to show that it intended to abandon the contracts.

Because the parties had settled the Doraville claim prior to trial, the court granted GM summary judgment on that claim. See Order of Feb. 13, 1998, at 11. It found that three small claims relating to the Doraville project had not been settled, however, and preserved those claims for trial. See id. (discussing field orders 17A, 53, and 54). The court proceeded to admit all of RMT's Doraville evidence at trial on the ground that it showed a pattern of conduct under Fed. R. Evid. 406. See Pre-Trial Conf. Tr. at 37-38 (RMT's counsel arguing for admission of the evidence under Rule 406 because it showed a habit or custom); Trial Tr. at 3-4 (court reiterating at the start of trial that all Doraville evidence would be admitted to show a routine practice by GM). We conclude that the court erred in admitting this evidence, for the record shows that the three claims related to Doraville had all been settled and formally added to the contract more than one year prior to trial. See Trial Tr. at 774, 1910; see also Def. Ex. 4330 (depicting the settlement amounts and contract revision numbers for field orders 17A, 53, and 54).

Even if it were held that the Doraville evidence was properly before the jury, there would nonetheless be insufficient evidence of abandonment because RMT failed to demonstrate that GM acted in a manner inconsistent with the terms of the contracts in delaying payment on the field orders. The contracts did not require GM to pay for emergency field order work immediately or within any specific amount of time. Rather, they simply required GM to pay invoices by the 25th of the month following the month in which they were formally approved. See GM 1638 § 44.14, Appellant's Appx. at

-10-

203.    Scott Simkins, RMT's accounts receivable manager, testified that GM consistently abided by these payment terms. See Trial Tr. at 946-47. The only basis for RMT's claim, then, is that the lengthy negotiation process for approving invoices was so excessive as to constitute an abandonment of the contracts.

We find this argument unpersuasive. RMT acknowledged that some of the delay in approving invoices could have been due to its own delay in submitting quotes to GM. See id. at 897-98. In addition, Simkins stated that the jury exhibits depicting the time required for payment of field orders failed to account for the thirty to sixty day "normal time lag" for approving invoices. Id. at 895.

Most importantly, the primary cause of the delay in payment was RMT's own failure to submit lien waivers from subcontractors. Simkins testified that on at least three occasions RMT violated the contracts by failing to use the funds that GM had provided to pay subcontractors. See id. at 944-45. As soon as RMT stopped paying subcontractors, it was unable to send GM invoices because "there were no waivers of lien." Id. at 945. Under GM's invoice-approval process, invoices that were not accompanied by lien waivers were returned to RMT. Although this greatly increased the time required for payment, the invoice-return policy was explicitly provided for in the contracts, and RMT understood that lien waivers were required for payment under the contracts and in the construction industry generally. See id. at 885-86. Thus, GM was enforcing, rather than abandoning, the terms of the contracts in withholding payments when RMT failed to provide lien waivers.

Under Michigan law, courts are not to read out of contracts clauses that have been freely negotiated and whose meaning is abundantly clear. See Whitaker v. Citizens Ins. Co. of Am., 476 N.W.2d 161, 163 (Mich. Ct. App. 1991); General Aviation, Inc. v. Cessna Aircraft Co., 915 F.2d 1038, 1041 (6th Cir. 1990) (applying Michigan law). RMT was experienced in contract negotiation and had entered into many contracts that contained change-order clauses. It could have avoided what it later

characterized as resulting unfairness by negotiating a different method of payment on field orders. For example, RMT could have insisted on a provision requiring GM to pay for "impact costs" caused by emergency field orders. See Uhle, 938 S.W.2d at 599 (stating that contractors can avoid inequity by including contractual provisions that cover additional expenses caused by emergency field orders).

On the record before us, no reasonable juror could have found that GM intended to abandon the contracts. Accordingly, GM was entitled to judgment as a matter of law on Count II. The judgment is reversed, and the case is remanded for further proceedings consistent with the views set forth in this opinion.[3]

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

---

[3]In light of our holding, GM's motion to strike portions of RMT's addendum and brief is denied as moot.